# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Goldberg v. Astor Plaza Condominium Ass'n*, 2012 IL App (1st) 110620

---

| | |
|---|---|
| Appellate Court Caption | MARGARET GOLDBERG, Plaintiff-Appellant, v. ASTOR PLAZA CONDOMINIUM ASSOCIATION, DANIEL G. MOHEN, TRAVIS W. COCHRAN, GEETA KRISHNAMURTHI, and WILLIAM S. LODER, Defendants-Appellees. |
| District & No. | First District, Sixth Division<br>Docket No. 1-11-0620 |
| Opinion filed<br>Rehearing denied<br>Modified Opinion filed | March 23, 2012<br>April 30, 2012<br>May 4, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from a dispute between an owner of a condominium unit and defendant condominium association, the trial court properly found that the windows of the individual units were to be maintained by the unit owners, that the board of directors of the association had the power to enter into a renovation loan and to increase the assessments to repay the loan, and that plaintiff failed to prove she was a victim of oppression, but the trial court erred by failing to award plaintiff reasonable attorney fees after she prevailed on the count of her complaint requiring the association to produce minutes of its board of directors meetings for specific periods of time. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-CH-24682; the Hon. Mary Mikva, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part with instructions. |

| Counsel on Appeal | Ted A. Donner, of Donner & Company Law Offices LLC, of Wheaton, for appellant. |
| --- | --- |
| | Arthur W. Aufmann and Jacob L.V. Armstrong, both of Law Offices of Edward T. Joyce & Associates, P.C., of Chicago, for appellees. |
| Panel | PRESIDING JUSTICE R. GORDON delivered the judgment of the court, with opinion. |
| | Justices Garcia and Palmer concurred in the judgment and opinion. |

**OPINION**

¶ 1      This appeal arises from a dispute between plaintiff Margaret Goldberg (Margaret) and defendants Astor Plaza Condominium Association (Association) and its board of directors in their individual capacities: Daniel Mohen, Travis Cochran, Geeta Krishnamurthi, and William Loder (collectively, the board).

¶ 2      BACKGROUND

¶ 3      I. Events Prior to Lawsuit

¶ 4      We begin by relating the background of the parties, which is set out in each party's brief and is uncontradicted by the other party. In her brief, Margaret states the following. Astor Plaza is an eight-unit condominium building located in Chicago. Margaret owns one of the units, and four of the others are owned by defendants Mohen, Cochran, Krishnamurthi, and Loder; the remaining three units are owned by Paula Krasny, Mark Karno, and David Drew. Margaret first moved into the building in 1983.

¶ 5      In 2005, Margaret expressed a number of concerns about the operation of the Association. As she testified at trial, she was concerned about a lack of communication among the unit owners and about problems with the internal and external structure of the units that needed to be addressed, including problems with windows and balconies, a lack of maintenance in the common areas, and the absence of reserves for the Association. Margaret was also concerned because board meetings were occurring but she was not provided notice or minutes of the meetings. The unit owners met to discuss Margaret's concerns and afterward, the manager came to inspect her windows.

¶ 6      In March 2006, a meeting was scheduled to elect a new board of directors, and the new board consisted of the individuals named as defendants in the instant case. The board had a few informal gatherings shortly after the election but did not hold another meeting until September 2006, when a meeting was scheduled to discuss proposed improvements. The project was expected to cost approximately $450,000. Since the Association did not have

sufficient funds in its reserves, the material distributed to the unit owners proposed that the Association seek a bank loan to fund the project which would be guaranteed by the unit owners. The other unit owners approved the financing, but Margaret was concerned that she could end up responsible for other unit owners' shares of the cost, so she filed a complaint on November 14, 2006.

¶ 7    In its brief, the Association adds the following facts. At the beginning of 2005, the board consisted of three unit owners but during 2005, the three board members resigned from the board or moved, leaving a period with no board management until the March 2006 election of the new board. Prior to the disintegration of the old board, Margaret had expressed a number of concerns before the board, and she renewed her grievances after the election of the new board.

¶ 8    One of the grievances raised by Margaret involved the replacement of her bay window, which she asked the Association to pay for. In response, the new board considered adopting a policy in which the Association would pay for bay windows while the unit owners would remain responsible for all other windows. However, prior to making a final decision, the board consulted with its attorneys, Keough & Moody, P.C. (K&M). In September 2006, K&M informed the board that article XIV, section 2(l), of the Association's declaration required all unit owners to maintain, repair, and replace all of the windows in their units. Consequently, the board informed Margaret that she would have to pay for the replacement of her bay window.

¶ 9    Margaret did not accept the board's decision and also objected to the board's renovation project. Margaret's attorney argued that article V, section 2, of the declaration prohibited the board from financing the renovation with an Association loan. In response, K&M opined that article V, section 2, applied only to unit owner loans and not to Association loans.

¶ 10    In order to respond to Margaret's complaints, the board authorized K&M to share its legal opinions with Margaret's attorney and K&M sent Margaret's attorney a letter on October 10, 2006, in which it explained its understanding that the Association had the authority to borrow money and that Margaret was responsible for maintaining, repairing, and replacing her own windows pursuant to the declaration. Margaret continued to object, and K&M sent another letter to Margaret's counsel on November 1, 2006, again stating the board's position. On November 6, 2006, a motion to increase the monthly assessments for the building renovation project was passed by a vote of all of the Association membership 7 to 1, with Margaret providing the only vote against the project. On November 14, 2006, Margaret filed her initial complaint.

¶ 11                                              II. Complaint

¶ 12    Margaret's complaint was amended several times during the pendency of the instant action, with the final complaint being the third amended complaint, filed on June 6, 2008. That complaint, including an amendment adding three additional counts that was filed on April 20, 2009, contained a total of 14 counts. The complaint included a "prefatory" section stating that counts I, II, IV, and VI of the complaint had been dismissed either due to mootness or pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-

-3-

615 (West 2008)) but that Margaret was including them "solely for purposes of preserving her objections for appeal." The prefatory section also noted that Margaret had named Karno, Krasny, and Drew as defendants solely for purposes of count XI.

¶ 13    The counts at issue in the case at bar are counts VII, VIII, X, and XIII, so we relate only the allegations relevant to those counts.

¶ 14    Count VII was against the Association and concerned failure to maintain common elements. The complaint alleges that Margaret "has a balcony which is substantially rusted, a deteriorating window frame in the front bay window, and side window frames which are badly deteriorated in [Margaret's] apartment." The complaint further alleges that "[n]otwithstanding a long history of discussion with regard to these elements, however, and assurances from both the current and prior boards, [the Association] has sought to avoid any responsibility for [Margaret's] balcony and window frames by summarily excluding them from the building's historical and published definition of what constitutes a common element."

¶ 15    According to the complaint, the Association based its determination on article XIV, section 2, of the declaration, which provided that the duties of the board included paying for

"tuckpointing, maintenance, decorating, repair, and replacement of the Common Elements (but not including the windows and glass doors appurtenant to the Unit, if any, *** which the Unit owners shall *** maintain and repair, except if necessitated by repairs to the Common Elements)."

The complaint alleges that the declaration did not exclude the Association's responsibility to maintain the window frames, as opposed to the windows themselves, and that the problem arose from structural defects in the building itself and not from the windows.

¶ 16    The complaint further alleges that the board has paid for correcting such problems in the past when they occurred in the units of board members and that the Association had assessed all of the unit owners previously in order to pay for repairs to balconies. Furthermore, the complaint alleges that board member Loder, purportedly on behalf of the board, had repeatedly promised Margaret that the window frame would be repaired.

¶ 17    Count VIII of the complaint is against the Association for relief pursuant to section 112.50 of the General Not For Profit Corporation Act of 1986 (Not For Profit Act) (805 ILCS 105/112.50 (West 2008)). The complaint alleges that based on all of the conduct set forth in the complaint, "the defendants have acted in a manner that is oppressive with regard to [Margaret's] interest in the building, in dereliction of the obligations imposed upon them by the governing documents, in bad faith and in an arbitrary, overbearing and heavy-handed manner, and in a manner likely to result in unnecessary waste, gross over-reaching, and expense that will need to be wrongfully borne by [Margaret]." Specifically, Margaret pointed to (1) the segregation of classes of unit ownership based on whether the unit owner was a board member, (2) the refusal of the board to complete the work required on Margaret's windows and balcony, and (3) the board's invalid and unenforceable procurement of financing for the renovation project. Accordingly, Margaret sought the appointment of a receiver to manage the business and affairs of the Association.

¶ 18    Count X was against the Association and sought relief under section 19 of the

Condominium Property Act (Condominium Act) (765 ILCS 605/19 (West 2008)) for failure to keep, maintain, and produce minutes of meetings. The complaint alleges that the board has never produced minutes of meetings held in 2005 and that the board has met a number of times without notice to the unit owners and without producing minutes of those meetings.

¶ 19 Count XIII was directed at the individual defendants and sought relief pursuant to section 103.20 of the Not For Profit Act (805 ILCS 105/103.20 (West 2008)). The complaint alleges that the individual defendants conspired to negotiate a financial agreement for the renovation project "which ran contrary to that initially disclosed to the unit owners, for a greater sum of money than that approved by the unit owners, and for additional work not contemplated by the original project or approved by the unit owners." The complaint further alleges that defendants knew prior to the vote on the project that the financing was not permitted under the Association's governing documents and therefore misrepresented the nature of the project. The complaint also alleges that the individual defendants secured an additional $100,000 line of credit that was largely used to pay their personal legal expenses and not for general building expenses as represented.

¶ 20                                    III. Motion to Compel

¶ 21 One of defendants' defenses to the complaint was that they had relied on the advice of counsel, and on March 11, 2010, the trial court considered Margaret's fourth motion to compel concerning that defense. The motion to compel requested the entry of an order compelling defendants to produce the documents listed in their privilege log since defendants had placed reliance on counsel at issue. At the hearing on the motion, Margaret's counsel pointed to the privilege log submitted by defendants and noted that the privilege log was over 300 pages, involving at least 1,000 pages of documents. The privilege log did not identify the specific subject matter for which the privilege was being asserted and Margaret's counsel asserted that "I have no idea, looking at that, whether what this involves is one of the subject matters for which there has been a waiver in this case." The court denied the motion, telling Margaret's counsel to take the depositions of defendants' former attorneys as planned and "[s]ee what they say." The court stated that it would reconsider the motion if necessary after the deposition but that it would not "deal with 'what if.' " After the depositions, Margaret filed another motion, but the trial court again denied the motion to compel.

¶ 22                                       IV. Trial

¶ 23 On September 29, 2010, following a bench trial, the trial court entered its judgment in a written opinion. The court made a number of findings of fact applicable to all counts: (1) that the Association's bylaws stated that the windows and interior surfaces of units are to be maintained, repaired, and replaced by the unit owners; (2) that "the Condominium's Declaration provides that in the event of any question of interpretation or application of the Declaration or by-laws, the determination thereof by the Board shall be final and binding"; (3) that "the Condominium's Declaration provides that the members of the Board shall not be liable to the unit owners for any mistake of judgment or any acts or omissions made in good faith"; (4) that the construction project was properly classified as a renovation; (5) that

"the Board had the power to enter into the renovation loan with Harris Bank and signed the loan agreement in good faith reliant on legal advice from the Board's attorney"; (6) that "the Board had legal authority and power to spend the loan proceeds to renovate the building and did so in good faith reliance on legal advice"; (7) that "the Board had the power to increase the assessment to repay the Association's loan and did so in good faith reliant on legal advice and a proper unit owner vote (7 to 1)"; and (8) that the individual defendants were entitled to indemnification by the Association "because they acted in good faith and in a manner they reasonably believed to be in the best interest of the Association."

¶ 24       Concerning count VII, the court noted that Loder advised Margaret that the Association would pay to replace her window, but that the assurance was given prior to the board's receipt of legal opinions that stated that the windows were the unit owners' responsibility. The court found that the board "acted on good faith reliance upon proper legal advice" and accordingly entered judgment in favor of the Association.

¶ 25       When discussing count VIII, seeking the appointment of a receiver, the court noted that Margaret was permitted to introduce evidence relating to other counts in support of her oppression claim.[1] The court observed that Margaret had argued that all of defendants' conduct, taken as a whole, demonstrated that the Association acted to oppress Margaret and that only through the appointment of a receiver could her rights as a unit owner be protected. However, the court found that Margaret was unable to prove that she was a victim of oppression. The court found that "[t]o date, the Board has failed to fully comply with their obligation to keep proper minutes of their meetings and provide those minutes to any unit owner. Their excuse that they are waiting for Mr. Karno's suggested procedure demonstrated a conscious disregard of their legally imposed duty." Nevertheless, the court found that the board's failure did not constitute oppression since Margaret had been permitted to have a shorthand reporter present at board meetings and thus was kept advised of board actions. The court rejected the rest of Margaret's allegations and evidence, finding that it failed to prove oppression by the Association and that "[i]n reality, what the evidence most clearly demonstrated is Plaintiff's refusal to accept that the Board's good faith interpretation and application of the Declaration or By-Laws is final and binding regarding disputes between the Board and a unit owner." The court accordingly entered judgment in favor of the Association as to count VIII.

¶ 26       With respect to count X, the court found that the Association had failed to comply with its statutory obligation to keep and maintain minutes of the board's meetings. The court further found that there was no evidence that any minutes were taken regarding the 2005-06 board and that the board had not approved any minutes subsequent to July 2007. Consequently, the court entered judgment in favor of Margaret and ordered the Association to produce "proper minutes for all meetings subsequent to July 2007" within 90 days of the judgment order. The court denied Margaret's request for attorney fees but ordered the

---

[1]Specifically, the court noted that Margaret "was allowed to introduce evidence relative to Counts I, II, IV, V and VI that had been disposed [of] prior to trial and to argue evidence relative to Counts III and VII that was received in the course of the trial."

Association to reimburse Margaret for all costs and fees that she paid in order to have a certified shorthand reporter record the board's meetings subsequent to July 2007.

¶ 27 The court entered judgment in favor of the individual defendants on count XIII, which concerned derivative claims, in light of the court's earlier findings applicable to all counts of the complaint.

¶ 28 Finally, the court considered a motion filed by Margaret requesting an award of attorney fees for defendants' failure to produce properly requested documents. The court found that defendants failed to produce a "very large quantity" of documents until the "virtual eve of trial," despite Margaret's numerous motions to compel and court orders requiring production of the documents. The court accepted Margaret's counsel's representation that timely production of the documents may have altered the direction of the litigation, and sanctioned defendants in the amount of $25,000 for their discovery violation, the amount of the court reporter expenses incurred by Margaret.

¶ 29 On January 18, 2011, the trial court[2] denied Margaret's motion for reconsideration. In its oral ruling, the court stated the following concerning the issue of attorney fees sought in count X:

"On the attorney's fees for production, her entitlement to attorney's fees for having the minutes produced, *** [t]he minutes under the state law, final minutes did not exist. Judge Riley recognized that that was not fair to the plaintiff to simply never finalize the final minutes, so he ordered the condo association to finalize those minutes and produce them within 90 days.

In terms of whether there should be some remedy for their failure to having finalized the minutes for so long, which clearly can be and he found to be problematic, he said, Well, in this case it really didn't prejudice the plaintiff because she did have a court reporter transcript available to her and she did that at her own expense and that expense would be reimbursed by the association.

I do not think there's any clear error in the way he handled the attorney's fee provision."

¶ 30 On February 17, 2011, the court entered an order concerning the amount owed to Margaret for hiring the certified shorthand reporter, thereby resolving any remaining issues in the case and Margaret filed her notice of appeal the same day.

¶ 31                                        ANALYSIS
¶ 32                               I. Count X: Attorney Fees
¶ 33 Margaret argues that the trial court erred by not awarding her attorney fees and costs after entering judgment in her favor on count X of her complaint. Margaret argues that section 19 of the Condominium Act (765 ILCS 605/19(b) (West 2006)) is a mandatory statute on the subject of attorney fees because of the statute's use of the term "shall." In addition, Margaret

---

[2]The trial was heard by Judge Daniel Riley. However, the posttrial motions were heard by Judge Mary Mikva due to Judge Riley's retirement.

argues that the trial court's examination of whether or not she suffered "prejudice" was inappropriate, because no such requirement is present in the statute.

¶ 34 Count X of Margaret's complaint seeks an order compelling the Association to produce minutes from meetings and an award of attorney fees and costs. The trial court found that the Association failed to abide by the statutory obligations imposed upon it to keep and maintain minutes of the Association's board of directors meetings. The trial court found that there was no evidence that any minutes were taken between 2005 and 2006, but found the record clear that the board had not approved any minutes subsequent to July 2007 and ordered them to produce those minutes. The trial court ordered the Association to pay Margaret $25,000 to reimburse her for court reporter fees incurred at board meetings as a discovery sanction, but disallowed any attorney fees, finding that Margaret had not established the elements of a claim for attorney fees under the statute, but failed to tell us what the elements are.

¶ 35 The issue here is whether or not the statute is mandatory. If a statute is mandatory, a trial court has no discretion in applying the statute. *People v. Delvillar*, 235 Ill. 2d 507, 516 (2009). Whether a statute is mandatory or discretionary is a matter of statutory construction and is reviewed *de novo*. *Delvillar*, 235 Ill. 2d at 517. *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011). The purpose of statutory construction is to "ascertain and give effect to the legislature's intent." *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 503-04 (2000). The best indication of legislative intent is the plain and ordinary meaning of the statutory language. *Paris v. Feder*, 179 Ill. 2d 173, 177 (1997); *Delvillar*, 235 Ill. 2d at 517.

¶ 36 The statute at issue states, in pertinent part, that "[a]ny member who prevails in an enforcement action to compel examination of the records *** *shall be entitled* to recover reasonable attorney's fees and costs from the association." (Emphasis added.) 765 ILCS 605/19(b) (West 2006). Our supreme court has held that the use of the term "shall" indicates that a statute is mandatory. *Citizens Organizing Project v. Department of Natural Resources*, 189 Ill. 2d 593, 598 (2000); *People v. Ramirez*, 214 Ill. 2d 176, 182 (2005) ("[i]t is well established that, by employing the word 'shall,' the legislature evinces a clear intent to impose a mandatory obligation").

¶ 37 Our supreme court has found that, in some circumstances, the context of a statute may dictate otherwise, and may find that the use of "shall" does not indicate a mandatory statute. See *In re Application of Rosewell*, 97 Ill. 2d 434, 440-41 (1983); *Cooper v. Hinrichs*, 10 Ill. 2d 269, 272 (1957). For example, the statute at issue in *Cooper* used the phrase "whenever possible" in addition to the term "shall," which our supreme court interpreted as indicating that the legislature did not intend for the law to be mandatory because the legislature anticipated cases in which following the statute would not be possible. *Cooper*, 10 Ill. 2d at 272-73. The entirety of an act may also be used to place a statute in context. In *Ramirez*, the supreme court found that a statute allowing criminal defendants to be tried *in absentia* required the clerk of the court to send notice to defendants via certified mail. *Ramirez*, 214 Ill. 2d at 182. The court held that the statute's use of "shall" meant that the legislature intended for the requirement to be mandatory because the statute read that notice "shall" be given by certified mail. *Ramirez*, 214 Ill. 2d at 182. Therefore, the court found that the

conviction was improper because the clerk did not send notice via certified mail. *Ramirez*, 214 Ill. 2d at 187. In *People v. Robinson*, 217 Ill. 2d 43, 59 (2005), analyzing *Ramirez*, the supreme court reiterated that the use of "shall" indicates a mandatory statute. The court then expanded upon this reasoning and found that the statute in *Ramirez* had the purpose of safeguarding the rights of criminal defendants being tried *in absentia*. *Robinson*, 217 Ill. 2d at 59. The court determined that the certified mail requirement served the "larger legislative scheme" of protecting constitutional rights, thus bolstering the already strong presumption that the statute was mandatory. *Robinson*, 217 Ill. 2d at 59.

¶ 38     In the case at bar, the statute at issue is a fee-shifting statute which clearly states that attorney fees shall be awarded if Margaret prevails against a condominium board in an enforcement action. 765 ILCS 605/19 (West 2006). In *Citizens Organizing Project*, the supreme court analyzed a similar fee-shifting statute that is part of the Illinois Administrative Procedure Act (5 ILCS 100/10-55 (West 1998)). *Citizens Organizing Project*, 189 Ill. 2d at 598. The statute applied when parties successfully brought an action against the government for violating an administrative rule. *Citizens Organizing Project*, 189 Ill. 2d at 598. The statute stated that the " 'court *shall* award the party bringing the action the reasonable expenses of the litigation, including reasonable attorney's fees.' " (Emphasis in original.) *Citizens Organizing Project*, 189 Ill. 2d at 598 (quoting 5 ILCS 100/10-55(c) (West 1998)). The supreme court found no reason to hold that the legislature did not intend the fee-shifting statute to be mandatory and determined that the trial court had no choice but to award attorney fees. *Citizens Organizing Project*, 189 Ill. 2d at 598.

¶ 39     Not all fee-shifting statutes are mandatory. In *McNiff v. Mazda Motor of America, Inc.*, 384 Ill. App. 3d 401, 405-06 (2008), the Illinois Appellate Court for the Fourth District found that a fee-shifting statute allowing for attorney fees was not mandatory. However, that case is distinguishable from the case at bar because the statute specifically stated that the award of attorney fees was within the court's discretion. *McNiff*, 384 Ill. App. 3d at 405 (quoting 15 U.S.C. § 2310(d)(2) (2000)). The statute stated that prevailing parties " '*may* be allowed by the court' " to recover costs, which the court has the discretion to determine. (Emphasis added.) *McNiff*, 384 Ill. App. 3d at 405 (quoting 15 U.S.C. § 2310(d)(2) (2000)). The statute also read that courts have the discretion to determine that an award of attorney fees may be inappropriate under the circumstances of the case. *McNiff*, 384 Ill. App. 3d at 405 (quoting 15 U.S.C. § 2310(d)(2) (2000)).

¶ 40     That is not the case here. The Illinois Condominium Property Act specifically states that prevailing parties "shall" be entitled to recover reasonable attorney fees. 765 ILCS 605/19(b) (West 2006). The use of the term "shall" strongly indicates that the legislature intended for this statute to be mandatory. *Citizens Organizing Project*, 189 Ill. 2d at 598; *Ramirez*, 214 Ill. 2d at 182; *Robinson*, 217 Ill. 2d at 59. No other language in the statute indicates that the legislature did not intend for the fee-shifting provision to be mandatory. Compare *Cooper*, 10 Ill. 2d at 272 (in which the use of the phrase "whenever possible," coupled with the term "shall," indicated that the legislature did not intend for the provision to apply in all cases). The supreme court held in *Citizens Organizing Project* that the very purpose of a fee-shifting statute was to discourage improper conduct and encourage parties to litigate against such improper conduct by removing the high cost of litigation and imposing it on wrongdoing

defendants. *Citizens Organizing Project*, 189 Ill. 2d at 598-99. The purpose of section 19 is to ensure that condominium boards remain accountable to their residents; therefore, the desire by the legislature to encourage litigation against improper conduct through mandatory fee-shifting is quite apparent.

¶ 41  We note the existence of a decision from this court that examined this statute. *Taghert v. Wesley*, 343 Ill. App. 3d 1140 (2003); however, we find the case distinguishable from the case at bar because the court did not consider whether the statute was mandatory. In *Taghert*, the plaintiff successfully proved that the defendants failed to provide requested condominium documents, and the trial court awarded attorney fees. *Taghert*, 343 Ill. App. 3d at 1142. On appeal, the defendants argued that the award of attorney fees was improper. *Taghert*, 343 Ill. App. 3d at 1147. This court determined that an award of attorney fees is a matter within the trial court's discretion and, finding no abuse of discretion, affirmed the award of fees. *Taghert*, 343 Ill. App. 3d at 1147-48. The court at no point addressed the purpose or rules of statutory construction, nor did it address the statute's use of the term "shall." Therefore, we do not find the reasoning of *Taghert* relevant to the disposition of the case at bar.

¶ 42  Here, the trial court rested its reasoning, in part, on the notion that because Margaret had obtained transcripts of the meetings through the use of a court reporter, she had not been "prejudiced" and was therefore not entitled to attorney fees. Margaret argues that such a finding is improper because nowhere in the statute is there a requirement that the plaintiff be "prejudiced" before she may recover attorney fees. 765 ILCS 605/19 (West 2006). Indeed, the only requirement given by the statute is that plaintiff prevails in her action to compel examination of records. 765 ILCS 605/19(b) (West 2006). Courts may not read in words to alter the meaning of statutes. *People v. Janas*, 389 Ill. App. 3d 426, 429-30 (2009), *appeal denied*, 233 Ill. 2d 579 (2009). To do so would be to contravene the legislature's intentions, because if the legislature had intended to include words in the statute, it would have done so. *Janas*, 389 Ill. App. 3d at 430.

¶ 43  The role of courts in interpreting statutes is to give effect to the legislature's intent when enacting a statute. When the statute is plain and unambiguous, we look only to what is actually contained within the statute by determining its plain and ordinary meaning. *Anthony v. Butler*, 166 Ill. App. 3d 575, 579 (1988). In the case at bar, neither party argues that section 19 is ambiguous, and we do not independently find it so. The plain and ordinary meaning of the statute expressly mandates that attorney fees "shall" be paid to the prevailing party. As a result, the trial court erred in failing to award reasonable attorney fees to Margaret after she prevailed in count X of her third amended complaint requiring defendant to produce minutes of its board of managers meetings for specific periods of time.

¶ 44  On Margaret's petition for rehearing, she states, "this Court appears to have granted Goldberg the relief sought by her with regard to Article 7, Section 4, notwithstanding the Court's Affirmation of the trial court's decision on the individual counts in question." We have not granted Margaret's relief which should be obvious and Margaret's argument to that effect is not persuasive. Margaret asks for clarification, but objects to this court making comments limiting the attorney fees to count X. As a result of Margaret's comments and judicial economy, we are compelled to include this direction in our opinion. Since this court affirmed the trial court on all counts at issue except count X, the trial court should consider

what fees were incurred by Margaret pertaining to count X only, because the Association should not be responsible for all the attorney fees Margaret incurred in this litigation. As to the question of out-of-pocket costs, if Margaret can show that she incurred costs pertaining to count X, she should be awarded those costs.

¶ 45                             II. The Other Counts

¶ 46                           A. The Window Controversy

¶ 47        When a controversy regarding the rights of a condominium unit owner in a condominium arises, we must examine any relevant provisions in the Condominium Property Act (765 ILCS 605/1 *et seq.* (West 2006)), and the declaration or bylaws of the condominium and construe them as a whole. *Carney v. Donley*, 261 Ill. App. 3d 1002 (1994) (citing *Wolinsky v. Kadison*, 114 Ill. App. 3d 527, 532 (1983)). The parties agree that article XIV, section 2(c), of this condominium declaration requires all unit owners to maintain, repair, and replace all of the windows in their units. Margaret argues that windows do not mean the structures that hold the window and the board found that it does.

¶ 48        Because many of the facts are not disputed, and because condominium declarations are covenants running with the land, we need only examine the language of the declaration in this case, to the extent the language is unambiguous, to determine whether the trial court acted properly. Since there are no disputed questions of material fact, we may properly address *de novo* the issue of whether the declaration authorized the board to approve Margaret's window renovation. *Carney*, 261 Ill. App. 3d at 1005. *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan*, 408 Ill. App. 3d at 578. Initially some or all of the board may have agreed with Margaret, but they changed their minds on the advice of counsel.

¶ 49        Because "the Association's by-laws state that the windows and interior surfaces of the units are to be maintained, repaired, and replaced by the unit owners," the board acted properly. In addition, the Association obtained a legal opinion on the window issue and acted on that opinion, finding that Margaret was responsible both for the window replacement and the structures holding the windows. The trial court was correct in finding for the defendants on this issue.

¶ 50                            B. Derivative Claims

¶ 51        Margaret first contends that condominium owners, such as herself, have standing to bring derivative suits against third parties, such as the individual defendants who were former board members.

¶ 52        A derivative action is an action that a corporate shareholder brings on behalf of a corporation to seek relief for injuries done to that corporation, where the corporation either cannot or will not assert its own rights. *Caparos v. Morton*, 364 Ill. App. 3d 159, 167 (2006). As the United States Supreme Court has explained:

> "[Derivative] lawsuits are one of the remedies which equity designed for those situations where the management through fraud, neglect of duty or other cause declines to take the

proper and necessary steps to assert the rights which the corporation has. The stockholders are then allowed to take the initiative and institute the suit which the management should have started had it performed its duty." *Meyer v. Fleming*, 327 U.S. 161, 167 (1946).

See *Brown v. Tenney*, 125 Ill. 2d 348, 355 (1988) (derivative suit is a "device to protect shareholders against abuses by the corporation, its officers and directors, and is a vehicle to insure corporate accountability").

¶ 53 Necessarily, therefore, the general rule under these cases is that shareholders may bring derivative suits against the third parties who have allegedly wronged the corporation. A derivative suit technically consists of two causes of action: one against the board of directors for failing to sue, and the other based upon the corporate right that was allegedly violated. *Brown*, 125 Ill. 2d at 355. Because of this, a corporation is a necessary party to a derivative suit on its behalf. *Meyer*, 327 U.S. at 167; *Metropolitan Sanitary District of Greater Chicago ex rel. O'Keeffe v. Ingram Corp.*, 85 Ill. 2d 458, 472 (1981). However, the corporation "is only nominally a defendant, since any judgment obtained against the real defendant runs in its favor." *Meyer*, 327 U.S. at 167.

¶ 54 Defendants do not concede in their brief that unit owners, such as plaintiffs, may bring derivative suits on behalf of a condominium association against the current board of directors. However, the case law in support of that proposition is instructive. *Board of Directors of Kennelly Square Condominium Ass'n v. Mob Ventures, L.L.C.*, 359 Ill. App. 3d 991, 995 (2005) (stating that unit owners "have the remedy of filing a derivative action against the Board if the Board fails to assert their claim against [third-party] defendants"); *Poulet v. H.F.O., L.L.C.*, 353 Ill. App. 3d 82, 100 (2004) (same). The defendants question whether Margaret had the standing to sue derivatively against the former members of the board.

¶ 55 Courts in other jurisdictions have answered this question in the affirmative. In the New Jersey decision of *Siller v. Hartz Mountain Associates*, 461 A.2d 568 (N.J. 1983), the Supreme Court of New Jersey dealt with the issue of who has the right to sue for injuries allegedly done to commonly owned condominium elements. The *Siller* court noted that New Jersey's condominium act states that the association has responsibility over the maintenance, repair, and replacement of such common elements. Thus, the *Siller* court held that unit owners could not pursue individual claims for damage to these elements: "A sensible reading of the statute leads to the conclusion that such causes of action belong exclusively to the association ***." *Siller*, 461 A.2d at 573-74. However, the court then went on to state:

> "This is not to say that a unit owner may not act on a common element claim upon the association's failure to do so. In that event the unit owner's claim should be considered derivative in nature and the association must be named as a party. ***
>
> The unit owner may also sue the developer on behalf of the association irrespective of its governing board's willingness to sue during the period of time that the association remains under the control of the developer." *Siller*, 461 A.2d at 574

Thus, although the right to sue belongs exclusively to the association, unit owners do not usurp that right by bringing derivative suits on the association's behalf against third parties;

rather, they are simply acting as the arms of the association to exercise that associational right.

¶ 56    The Supreme Judicial Court of Massachusetts reached a similar conclusion in *Cigal v. Leader Development Corp.*, 557 N.E.2d 1119 (Mass. 1990). The *Cigal* court found that unit owners lacked standing to pursue individual claims against a subcontractor for defects in the construction of commonly owned areas, as such claims were the exclusive province of the association. *Cigal*, 557 N.E.2d at 1122-23 (citing *Siller*, 461 A.2d at 568). Instead, the *Cigal* court stated that the unit owners' proper recourse was to bring a derivative suit on behalf of the association against the subcontractor, and on remand it instructed that the unit owners be given leave to amend their complaint to proceed on a derivative basis. *Cigal*, 557 N.E.2d at 1123 n.10. The court noted that a derivative suit against the third party was appropriate in light of the unit owners' allegation that they brought suit only after repeated efforts to convince the association to pursue the matter on its own. *Cigal*, 557 N.E.2d at 1123 n.10.

¶ 57    Here, defendants claim that Margaret did not have derivative standing to bring her claims because she did not fairly and adequately represent the interests of the members similarly situated in enforcing the rights of the corporation. Since the action is against former board members for mishandling the association's resources, we find Margaret has standing.

¶ 58    The trial court recognized and decided these claims, which were enumerated in count XIII, as "a series of derivative claims."

¶ 59    The trial court found in favor of the individual defendants. Margaret's brief before this court points only to the board's decision not to reimburse Margaret for repairs, claimed in common elements adjoining her window. Margaret's brief indicates that she produced Marco Parra, who testified that the damage was caused by a problem in the building walls and common areas, and thus it was the responsibility of the Association.

¶ 60    In deciding a case based on the evidence, our standard of review is manifest weight of the evidence, which means a reviewing court should overturn a trial court's factual findings only if they are against the manifest weight of the evidence. *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446 (2009). "A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence." *Bazydlo v. Volant*, 164 Ill. 2d 207, 215 (1995). This deferential standard of review exists because the trial court is in a superior position to determine and weigh the credibility of the witnesses, observe witnesses' demeanor, and resolve conflicts in their testimony. *People v. Jones*, 215 Ill. 2d 261, 268 (2005).

¶ 61    Marco Parra was never qualified as an expert in anything in the trial of this matter. He testified that he worked construction for six years and performed some construction work at the property located at 39 East Schiller in two units, one being that of Margaret. He oversaw and managed the replacement of Margaret's first-floor bay window. Parra then read from certain trial exhibits presented to him. Parra testified that when the bay window was taken out he observed damage on the window pane and below the sill he observed that the framing was rotted as well as the sill. There was no testimony by Parra as to the costs that would apply to repair the common elements adjoining Margaret's window and no foundation was laid to show he would be able to distinguish the costs paid by Margaret for common elements

-13-

from the costs incurred for the replacement of the window and its internal structure. As a result, we cannot overturn the trial court's factual findings as against the manifest weight of the evidence.

¶ 62    The individual members of the board of a condominium association owe a fiduciary duty to the unit owners (765 ILCS 605/18.4 (West 2006); *Wolinsky v. Kadison*, 114 Ill. App. 3d 527, 533 (1983)). This fiduciary duty requires that board members act in a manner reasonably related to the exercise of that duty and the failure to do so results in liability for the board and its individual members. *Wolinsky*, 114 Ill. App. 3d at 533-34. When a board properly exercises its business judgment in interpreting its own declaration, we will not find the board's interpretation a breach of fiduciary duty. *Carney*, 261 Ill. App. 3d at 1011 (citing *Yorkshire Village Community Ass'n v. Sweasy*, 170 Ill. App. 3d 155, 159 (1988)).

¶ 63    Under the business judgment rule, "[a]bsent evidence of bad faith, fraud, illegality, or gross overreaching, courts are not at liberty to interfere with the exercise of business judgment by corporate directors." *Fields v. Sax*, 123 Ill. App. 3d 460, 467 (1984); see *Stamp v. Touche Ross & Co.*, 263 Ill. App. 3d 1010, 1015 (1993). The purpose of this rule is to protect directors who have been diligent and careful in performing their duties from being subjected to liability from honest mistakes of judgment. *Stamp*, 263 Ill. App. 3d at 1015. However, it is a prerequisite to the application of the business judgment rule that the directors exercise due care in carrying out their corporate duties. *Stamp*, 263 Ill. App. 3d at 1016. If directors fail to exercise due care, then they may not use the business judgment rule as a shield for their conduct. *Stamp*, 263 Ill. App. 3d at 1016; *Lower v. Lanark Mutual Fire Insurance Co.*, 114 Ill. App. 3d 462, 467 (1983) (directors must be diligent and careful in carrying out their duties to earn the protection of the business judgment rule); *Ferris Elevator Co. v. Neffco, Inc.*, 285 Ill. App. 3d 350, 354 (1996) (evidence of directors' lack of due care was sufficient to overcome the business judgment rule).

¶ 64    One component of due care is that directors must inform themselves of material facts necessary for them to properly exercise their business judgment. *Stamp*, 263 Ill. App. 3d at 1015 (citing *Gaillard v. Natomas Co.*, 256 Cal. Rptr. 702, 711 (Cal. Ct. App. 1989) (directors "may not close their eyes to what is going on about them in corporate business, and must in appropriate circumstances make such reasonable inquiry as an ordinarily prudent person under similar circumstances")). Thus, the business judgment rule is defeated where directors act without "becoming sufficiently informed to make an independent business decision." *Ferris*, 285 Ill. App. 3d at 354.

¶ 65    Here, we conclude that the board members did not breach their fiduciary duty to the unit owners when they interpreted the declaration to conclude that the board did not have the authority to pay for Margaret's windows and surrounding structures. The record shows that the board sought legal advice before reaching its decision and relied on that advice in reaching its decision.

¶ 66            C. The Association Had the Authority to Enter
                Into Loans for Needed Renovation

¶ 67    Margaret claims that the board did not have the authority to enter into a financial

-14-

agreement involving "structural alterations, additions to, or improvements of the common elements," without unit owner approval of a special assessment, which the unit owners were prohibited from doing in a manner that would result in a lien on the property under the Association bylaws, article XIV(2)(g).

¶ 68     The trial court properly concluded that the board had the authority to enter into the loan after seven out of eight unit owners approved the work to be done and increase in assessment. We review this issue *de novo* because it concerns statutory construction. *Delvillar*, 235 Ill. 2d at 517.

¶ 69                              D. Condominium Property Act

¶ 70     The Condominium Property Act (765 ILCS 605/18.4 (West 2006)), states:

"Powers and Duties of Board of Managers. The board of managers shall exercise for the association all powers, duties and authority vested in the association by law or the condominium instruments except for such powers, duties and authority reserved by law to the members of the association. The powers and duties of the board of managers shall include, but shall not be limited to, the following:

(a) To provide for the operation, care, upkeep, maintenance, replacement and improvement of the common elements. Nothing in this subsection (a) shall be deemed to invalidate any provision in a condominium instrument placing limits on expenditures for the common elements, provided, that such limits shall not be applicable to expenditures for repair, replacement, or restoration of existing portions of the common elements. The term 'repair, replacement or restoration' means expenditures to deteriorated or damaged portions of the property related to the existing decorating, facilities, or structural or mechanical components, interior or exterior surfaces, or energy systems and equipment with the functional equivalent of the original portions of such areas. Replacement of the common elements may result in an improvement over the original quality of such elements or facilities; provided that, unless the improvement is mandated by law or is an emergency as defined in item (iv) of subparagraph (8) of paragraph (a) of Section 18 [765 ILCS 605/18], if the improvement results in a proposed expenditure exceeding 5% of the annual budget, the board of managers, upon written petition by unit owners with 20% of the votes of the association delivered to the board within 14 days of the board action to approve the expenditure, shall call a meeting of the unit owners within 30 days of the date of delivery of the petition to consider the expenditure. Unless a majority of the total votes of the unit owners are cast at the meeting to reject the expenditure, it is ratified."

¶ 71     This statute provides the authority for the board to finance the work notwithstanding the conditions in the Association's declaration.

¶ 72     The statute states that limits on expenditures "shall not be applicable to expenditures for repair, replacement, or restoration of existing portions of the common elements." As a result, article XIV(2)(g) of the Association's bylaws is a limitation and not applicable to this project. The project consists of "interior and exterior renovations to the common elements,

-15-

consisting of painting, installation of all new trim in common hallways, all new unit entry doors, updating of the elevator interior, facade repairs/replacements, masonry, tuckpointing, balcony fencing, [and] installation of paver a brick drive."

¶ 73    Even if some of these items are considered improvements as Margaret claims, seven out of eight condominium owners approved the work and the loans. If the process that was utilized did not occur exactly as the statute dictates, the law would not require a futile act to redo the process. *People v. Cameron*, 286 Ill. App. 3d 541, 544 (1997), *appeal denied*, 173 Ill. 2d 530 (1997).

¶ 74    Section 2.1 of the Act provides that any provisions of a condominium instrument that contains provisions inconsistent with the provisions of this Act are void as against public policy and ineffective. *River Plaza Homeowner's Ass'n v. Healey*, 389 Ill. App. 3d 268, 278 (2009). We find that the board's action in obtaining the loan was proper and affirm the trial court's decision as to the loan being appropriate. We have the right to affirm a trial court's decision even when we do not agree with its analysis. See *In re Alfred H.H.*, 233 Ill. 2d 345, 347 (2009) (affirming a case on different grounds than those relied upon by the appellate court).

¶ 75                    E. Production of Documents Relating to the
                        Legal Opinions Relied on by the Board

¶ 76    Margaret was denied her request to review the Association's attorneys' documents under which they claimed reliance. Although this court decided many of the issues of this case basically on statutory construction instead of the business judgment of the board, we will still decide this issue because the trial court decision, as well as our own, discussed the business judgment of the board and its reliance on the legal opinions. The trial court's refusal to compel the production of documents based on attorney-client privilege is reviewed *de novo*. *Sterling Finance Management, L.P. v. UBS PaineWebber, Inc.*, 336 Ill. App. 3d 442, 446 (2002).

¶ 77    Margaret argues that she was deprived of a fair trial because of the trial court's failure to order the production of documents the Association received from its attorneys and documents generated between the Association and its attorneys. Defendants in their brief fail to answer Margaret's arguments, contending only that Margaret cannot establish reversible error.

¶ 78    The purpose of the attorney-client privilege is "to encourage and promote full and frank consultation between a client and legal advisor by removing the fear of compelled disclosure of information." *Consolidation Coal Co. v. Bucyrus-Erie Co.*, 89 Ill. 2d 103, 117-18 (1982). However, because the privilege poses a bar to the discovery of relevant and material facts, it is an exception to the general duty to disclose and is interpreted narrowly. *Consolidation Coal*, 89 Ill. 2d at 118.

¶ 79    The privilege log in the case at bar is approximately 265 pages long, with 10 to 15 documents referenced per page. Margaret claims that she was unable to determine whether the privilege had been waived with respect to any of the documents in the privilege log because the descriptions of the subject matter were insufficient. However, there is no

indication in the record that Margaret asked the trial court to make any determination concerning the applicability of the privilege to the specific documents at issue; instead, Margaret generally requested production of the documents so that her attorney could determine if they were privileged or at least a more specific privilege log. Likewise, there is no indication in the record that the trial court reviewed the documents *in camera* to determine whether they were covered by the attorney-client privilege. Without this information, we cannot review the propriety of the trial court's finding. Most importantly, the correspondence between a board and its attorney is ordinarily originated in a confidence that the correspondence would not be disclosed, was made by an attorney acting in his legal capacity for the purpose of securing legal advice, and would remain confidential. *Consolidation Coal*, 89 Ill. 2d at 119. And, finally, the denial by the trial court did not affect the outcome of this case.

¶ 80    As a result, we affirm the trial court's denial of Margaret's motion to compel the production of the documentation contained in the privilege log.

¶ 81                                    CONCLUSION

¶ 82    As to count X, we find that the statute is mandatory and attorney fees "shall" be paid to the prevailing party and we reverse the trial court with instructions. As to all other counts, we affirm the judgment of the circuit court of Cook County.

¶ 83    Affirmed in part and reversed in part with instructions.