# Illinois Official Reports

## Appellate Court

---

**Commonwealth Edison Co. v. Elston Avenue Properties, LLC, 2017 IL App (1st) 153228**

---

| | |
|---|---|
| Appellate Court Caption | COMMONWEALTH EDISON COMPANY, Plaintiff-Appellee, v. ELSTON AVENUE PROPERTIES, LLC, DEVELOPMENTAL RESOURCES, INC., MARIA PAPPAS, Treasurer and County Collector of Cook County, DAVID ORR, County Clerk of Cook County, and UNKNOWN OWNERS, Defendants (Elston Avenue Properties, LLC, Defendant-Appellant). |
| District & No. | First District, First Division<br>Docket No. 1-15-3228 |
| Filed | March 31, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-L-50404; the Hon. Alexander P. White, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Thomas F. Geselbracht, of DLA Piper LLP, of Chicago, for appellants.<br><br>Michael Leroy, of Neal & Leroy, LLC, and John Rosenblatt, of G&R Public Law & Strategies, both of Chicago, for appellee. |
| Panel | JUSTICE SIMON delivered the judgment of the court, with opinion.<br>Justices Harris and Mikva concurred in the judgment and opinion. |

**OPINION**

¶ 1    This appeal follows drawn-out negotiations and proceedings precipitated by eminent domain. Commonwealth Edison Company (ComEd) needed to dig on private property to run underground wires. The parties reached an agreement on compensation and on the specifications for digging and restoring the property. ComEd did not specifically follow the agreed-upon specifications for refilling the dig sites, resulting in nonconforming work. Nonetheless, ComEd asked the court to approve its performance and rule that its obligations had been satisfied. After the parties presented evidence, the trial court issued an order of satisfaction from which the property owner now appeals. We affirm.

¶ 2                                     BACKGROUND

¶ 3    Plaintiff ComEd filed an eminent domain suit to take underground easements on property owned by defendant Elston Avenue Properties, LLC (Elston Properties). The purpose of the taking was to construct deep vaults beneath the surface of the property in order to ultimately carry electric transmission lines under the Chicago River. The easements were part of plans for the "West Loop Project" designed to reinforce the electrical capacity provided to the Chicago Central Business District. After the case was filed and after Elston Properties filed a traverse,[1] the parties negotiated the easements and entered an agreed judgment. The agreed judgment, as amended (referred to as the Final Order), stipulated the compensation to be paid for the easements and the specifications for construction. Judgment was entered on the Final Order terminating the eminent domain proceedings.

¶ 4    Construction began and ComEd excavated four shafts over 57-feet deep. The shafts were approximately 14-feet wide and 35-feet long. They were reinforced with steel bracing. ComEd then tunneled from the shafts under the river and ran the transmission lines through conduits to their destination. The shafts were then backfilled and the surface was restored. However—and this is the genesis of the dispute—ComEd deviated from the agreed specifications and filled a portion of the vaults with sand where the Final Order called for concrete.

¶ 5    Following construction, ComEd tendered "as-built plans" to Elston Properties. ComEd then filed a motion in the trial court for an order of satisfaction. That motion stated that all compensation had been paid and that all work had been completed and, therefore, that ComEd was seeking a determination that its obligations under the Final Order were satisfied.

¶ 6    Elston Properties noticed a deviation between the as-built plans and the specifications set forth in the Final Order and alerted ComEd. The as-built plans indicated (as was actually the case) that sand had been used instead of concrete in some areas. After being notified of the deviation, ComEd prepared "revised" as-built plans that depicted concrete in much of the area where it was supposed to be according to the Final Order but where the original as-built plans indicated (again, as was actually the case) that sand had been used. During the eight months between Elston Properties notifying ComEd about the deviation and ComEd tendering the revised plans, Elston Properties had performed its own testing on the composition of the vaults. The testing demonstrated that the originally tendered as-built plans actually reflected the true method of construction—that sand had been used in areas where concrete was called for.

---

[1]A traverse is a method by which a property owner can challenge a condemnation proceeding. *Forest Preserve District v. Miller*, 339 Ill. App. 3d 244, 250 (2003).

Elston Properties therefore believed that ComEd was attempting to deceive it with the revised as-built plans.

¶ 7 There are two components of the construction that are important to distinguish—the duct banks and the shafts themselves. The duct banks consist of the conduits that run horizontally underground, and the shafts are the vertical cavities descending from ground level to reach the conduits. The specifications originally stated that the ducts were to be encased with 3000 psi concrete and then, using stair-stepping, 1500 psi concrete was to be placed on top to fill the shaft excavation. However, after construction began, the parties agreed to modify that backfilling specification. Because the stair-stepping required for placing the 1500 psi concrete over the 3000 psi concrete was time-consuming and expensive, the parties agreed to just use 3000 psi concrete throughout.[2] During the course of construction, however, ComEd gave the instruction to the contractor to perform the duct backfilling with lifts of 3000 psi concrete "and then backfill with compacted thermal sand." The parties had agreed to modify the original agreement so that some sand could be used as backfill in the duct banks, but they never agreed to such a modification for backfilling the vaults in the manner it was done. There is no genuine dispute that the backfilling was not done in accordance with the Final Order.

¶ 8 The specifications for construction set forth in the parties' "Statement of Conditions and Restrictions" and incorporated into the Final Order are intended "to assure ability of the Owner to build over the ComEd facilities." To that end, the Final Order states that:

> "Upon completion of the installation of the Project Facilities in the Permanent Subterranean Easement Areas, the Owner shall have the right to construct improvements, including buildings, or grant easements above, or between, or beyond the Project Facilities, provided only that the concrete encasement around the Project Facilities (the 1500 psi lean concrete at the vault excavations and the 100 psi flowable fill concrete at the duct bank excavations) will not be penetrated by the foundations. The Owner may install deep foundations (bearing elevation below -9.00 CCD) having a maximum bearing pressure of up to 20,000 pounds per square foot anywhere within the Permanent Subterranean Easement Area. Deep foundations located directly above the 6' diameter reinforced concrete pipe casing shall be designed so that they do not exceed the load carrying capability of the pipe. Shallow foundations (bearing elevation above -9.00 CCD) located directly above Project Facilities cannot exceed a net bearing pressure of 4,000 pounds per square foot."

The parties dispute the interpretation of that paragraph as to what type of foundations are allowed in what locations.

¶ 9 ComEd's position is that the parties' understanding was always that the easement construction would allow Elston Properties to construct low-rise construction with shallow foundations on top of the vaults. In contrast, Elston Properties' position is that the agreement

___

[2]The original agreed order stated that "The vault excavations must be filled with min. 1500 psi lean concrete to a level eight (8) feet below existing grade, then CA-1 compacted to 95% modified proctor to a level four (4) feet below grade, then clay compacted to 95% modified proctor to grade." The Final Order states that "the required vault excavations be filled with 3000 psi concrete to a level of -5 CCD, then granular thermal backfill compacted to 95% modified proctor to elevation 0 CCD, then CA-1 compacted to 95% modified proctor level four (4) feet below grade, then clay compacted to 95% proctor to grade."

was premised on the expectation that it would be able to build just about anything on the property that it could have built before the easement construction. The parties dispute whether the deviation from the Final Order resulted in any loss of utility on the site or adversely affected Elston Properties' development rights.

¶ 10       The trial court held an evidentiary hearing in order to rule on ComEd's motion for an order of satisfaction. The hearing was held over nine nonconsecutive days with five live witnesses and 78 exhibits being entered into evidence. The trial court issued an 81-page order finding that ComEd breached the agreed order but that the breach was not material and ComEd had substantially complied. The trial court also found that Elston Properties failed to mitigate its damages for a portion of the work. The trial court granted ComEd's motion for an order of satisfaction. Elston Properties appeals that ruling.

¶ 11                                            ANALYSIS
¶ 12       The issue on appeal is whether the trial court properly issued an order of satisfaction despite the fact that the construction did not fully comply with the Final Order. The general rule is that a reviewing court should only interfere with a trial court's decision on whether a release or satisfaction of judgment is proper if the trial court abused its discretion. *Meyer v. First American Title Insurance Agency of Mohave, Inc.*, 285 Ill. App. 3d 330, 336 (1996). However, this case also includes questions of law (such as contract interpretation) that we review *de novo* and questions of fact (such as weighing and resolving disputes in testimony) that we review under the manifest weight of the evidence standard. *K's Merchandise Mart, Inc. v. Northgate Ltd. Partnership*, 359 Ill. App. 3d 1137, 1142 (2005); *Goldberg v. Astor Plaza Condominium Ass'n*, 2012 IL App (1st) 110620, ¶ 60.

¶ 13       An agreed order adopted by the court, also termed a consent order or a consent decree, is not an adjudication of the parties' rights but, rather, a record of their private, contractual agreement. *In re Marriage of Rolseth*, 389 Ill. App. 3d 969, 971 (2009). Consent judgments should be characterized as contractual agreements and are controlled by the law of contracts. *People v. Scharlau*, 141 Ill. 2d 180, 195 (1990). Like other contracts, consent decrees must be construed to give effect to the intention of the parties which, when there is no ambiguity in the terms, must be determined from the language of the consent decree alone. *Allied Asphalt Paving Co. v. Village of Hillside*, 314 Ill. App. 3d 138, 144 (2000).

¶ 14       The first finding made by the trial court was that ComEd breached the Final Order by failing to follow the fill specifications. ComEd has admitted as much in the trial court and in its submissions here. The evidence plainly showed that ComEd did not perfectly comply with the provisions of the Final Order by, as the trial court found, "substituting granular fill for concrete in certain elevations." Elston Properties maintains that the trial court's inquiry should have ended there—upon finding any nonconformance with the terms of the Final Order. It argues that the only issue that may be raised in a motion for an order of satisfaction is whether the judgment has been satisfied (citing *Nickerson v. Suplee*, 174 Ill. App. 136, 140 (1912)).

¶ 15       However, as ComEd argues, whether the agreement has been "satisfied" requires the application of contract principles. Elston Properties accepts that contract law controls, but it does not, as it must, also accept that relief is conditioned on harm. It is not enough that there is a difference between existing conditions and the specified conditions. The difference must matter to the rights of the parties. Under the circumstances, the trial court was correct to turn to

the question of materiality and assess whether Elston Properties' rights under the Final Order had been infringed in a manner that would render ComEd's obligations not satisfied.

¶ 16    The dispute here calls to mind the famous "Reading pipe" case. In *Jacob & Youngs, Inc. v. Kent*, 129 N.E. 889 (N.Y. 1921), the plaintiff-builder agreed to construct a house for the defendant-homebuyer. One of the specifications for the plumbing work was that all wrought iron pipe used in the construction be "of Reading manufacture." (Internal quotation marks omitted.) *Id.* at 890. Several months after the end of construction, the homebuyer discovered that some of the pipe used, instead of being made in Reading, had been made in other factories. Meeting the specifications, at that juncture, would have meant demolition of significant parts of the structure. *Id.*

¶ 17    All of the evidence showed that the nonconforming pipes that were installed could accomplish anything that the Reading pipes could; they were just the wrong brand. *Id.* There was no fraud or willfulness, the builder made an error. But that mistake undoubtedly resulted in a deviation from the specifications the parties agreed to. Judge Cardozo elucidated that the court must draw a line between the important and the trivial omissions so as to not let "the significance of the default [be] grievously out of proportion to the oppression of the forfeiture." *Id.* at 891. The measure of damages in a case where there is substantial performance is the difference in value, which was nil. *Id.* at 891-92. The dissenting opinion in the case—which has long been defeated in the development of the law—is the outcome Elston Properties urges us to accept.[3]

¶ 18    So we turn to the issue of materiality. Construing the Final Order as a contract and applying contract principles, the trial court found that the breach was not material. It has been said that a breach is material when it is fundamental or defeats the purpose of the contract.

> "The determination of whether a breach is material 'is a complicated question of fact involving an inquiry into such matters as whether the breach worked to defeat the bargained-for objective of the parties or caused disproportionate prejudice to the non-breaching party, whether custom and usage considers such a breach to be material, and whether the allowance of reciprocal non-performance by the non-breaching party will result in his accrual of an unreasonable or unfair advantage.' " *William Blair & Co. v. FI Liquidation Corp.*, 358 Ill. App. 3d 324, 346-47 (2005) (quoting *Sahadi v. Continental Illinois National Bank & Trust Co. of Chicago*, 706 F.2d 193, 196 (7th Cir. 1983)).

¶ 19    Factors to consider in determining whether a breach is material include: (1) the extent to which the injured party will be deprived of the benefit that he or she reasonably expected; (2) the extent to which the injured party can be adequately compensated for the part of that benefit of which he or she will be deprived; (3) the extent to which the party failing to perform or to

---

[3]Elston Properties points us to *Hardin, Rodriguez & Boivin Anesthesiologists, Ltd. v. Paradigm Insurance Co.*, 962 F.2d 628, 636 (7th Cir. 1992), which discusses *Jacob & Youngs*. Elston claims that *Hardin* stands for the proposition that substantial compliance is not available when a party demands strict performance. Incorrect. The homeowner in *Jacob & Youngs* certainly wanted strict performance—that was the premise of the case. *Hardin* dealt with conditions precedent not the actual performance of the agreement. See *id.* at 636-37. The dissent in *Jacob & Youngs* took the position that strict compliance was required unless waived. *Jacob & Youngs*, 129 N.E. at 893 (McLaughlin, J., dissenting, joined by Pound and Andrews, JJ.). The dissent's position never became accepted law.

offer to perform will suffer forfeiture; (4) the likelihood that the party failing to perform or to offer to perform will cure his or her failure, taking account of all the circumstances, including any reasonable assurances; and (5) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing. *Rubloff CB Machesney, LLC v. World Novelties, Inc.*, 363 Ill. App. 3d 558, 564 (2006) (citing Restatement (Second) of Contracts § 241 (1981)). Because the determination of whether a breach is material is a question of fact, we will only disturb the trial court's decision on the issue if it is against the manifest weight of the evidence. *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 72 (2006).

¶ 20 After hearing the evidence, the trial court found that Elston Properties was not deprived of any benefit that it could have reasonably expected under the Final Order. The trial court explained that Elston Properties could not have reasonably expected to place 20,000 psf foundations in the vaults because the Final Order only provides for shallow foundations not bearing more pressure than 4000 psf over the project facilities. The trial court then pivoted to whether ComEd substantially complied with the Final Order. Taking the expert testimony into consideration, the trial court concluded that with the existing construction, Elston Properties had the ability to apply 4000 psf shallow foundations in the vaults or 20,000 psf deep foundations outside the vaults as contemplated by the Final Order. Accordingly, the trial court held that ComEd substantially complied with the agreed order so that the issuance of an order of satisfaction was warranted. For the reasons that follow, the trial court's findings were not against the manifest weight of the evidence.

¶ 21 Paragraph B6 of the Final Order is at the center of the issue. It states that deep foundations are permitted in the easement area, but that only shallow foundations are allowed directly above the vaults.

> "Upon completion of the installation of the Project Facilities in the Permanent Subterranean Easement Areas, the Owner shall have the right to construct improvements, including buildings, or grant easements above, or between, or beyond the Project Facilities, provided only that the concrete encasement around the Project Facilities (the 1500 psi lean concrete at the vault excavations and the 100 psi flowable fill concrete at the duct bank excavations) will not be penetrated by the foundations. The Owner may install deep foundations (bearing elevation below -9.00 CCD) having a maximum bearing pressure of up to 20,000 pounds per square foot anywhere within the Permanent Subterranean Easement Area. Deep foundations located directly above the 6' diameter reinforced concrete pipe casing shall be designed so that they do not exceed the load carrying capability of the pipe. Shallow foundations (bearing elevation above -9.00 CCD) located directly above Project Facilities cannot exceed a net bearing pressure of 4,000 pounds per square foot."

As that provision states, the parties agreed that Elston Properties was allowed to build on top of the easement area, with shallow foundations over the vaults and related shoring, mud slabs, duct banks, and cable and concrete encasements; while it was allowed to build with deep foundations in the remainder of the easement area. The evidence showed that the compacted fill in the vaults was sufficient to support the shallow foundations at 4000 psf that the Final Order called for. The trial court accepted this evidence and, thus, found that the deviations from the specifications were not material.

¶ 22    Elston Properties' proffered interpretation of paragraph B6 is that "there is actually no limitation in the Final Order on what can be placed on top of the vaults." It contends that deep foundations are permitted anywhere in the permanent easement area. Elston Properties argues that paragraph B6 does not state that only shallow foundations are allowed directly above the project facilities, just that, where shallow foundations are in fact located, they cannot exceed pressure above 4000 psf. But the interpretation advocated by ComEd and adopted by the trial court is the proper one in light of the plain language of that paragraph. Moreover, the testimony supports the interpretation that was adopted, in that it squares with the realities of the site and the need to ensure that the transmission lines are protected in the manner described by Christopher Perry, ComEd's expert.

¶ 23    The connotation in the common understanding of the difference between using concrete and sand to fill a void would lead one to believe that substituting one for the other would always be material. Here, though, the modified proctor that was used was compacted to 95%, the highest level of compaction for the granular fill. After each foot of fill was placed in the vaults, it was densely compacted and then tested by Testing Services Corporation to ensure that each specific foot of fill put in place achieved the required density. Testing Services Corporation, on behalf of Elston Properties, conducted around 300 contemporaneous density tests covering every foot of thermal fill in the vaults. All that was required was that the vaults were capable of bearing up to 4000 psf. There was no persuasive evidence presented to rebut the affirmative evidence that, as constructed, the vaults could bear the shallow foundations called for by the Final Order. There was also no evidence presented that ComEd departed from the specifications on purpose. The immaterial deviation from the specifications did not frustrate any purpose of the Final Order.

¶ 24    At the evidentiary hearing, Elston Properties promoted its position that the parties intended to use the 3000 psi concrete-filled vaults themselves as deep foundations—as caissons to build on top of. If it were permitted to use the vaults as caissons, Elston Properties contends, the easement area would have been suitable for constructing a high-rise building atop the easements. Nothing in the Final Order supports a conclusion that anyone ever contemplated a high-rise building being constructed on top of the vaults. Elston Properties presented the testimony of Mr. Giannopoulos that he discussed the concept of using the vault as a caisson with ComEd before construction. ComEd offered evidence to the contrary. The trial court sided with ComEd, finding that the caisson theory was not credible.

¶ 25    Elston Properties also presented evidence of boring tests that it conducted. It conducted a test by boring a deep hole into each vault to test the density of the fill. One of the tests showed looser compacting than the 95% requirement in one of the vaults. In addition, Elston Properties' expert offered an opinion that geotechnical data showed that there was deficient compacting in two of the vaults. On the other hand, Testing Services Corporation conducted contemporaneous compaction testing on behalf of Elston Properties on each foot of fill in the vaults and ComEd's expert testified that the fill was adequately dense. Even though some data led Elston Properties' experts to conclude that there was looser compaction than represented, the trial court found that there was no evidence to lead to the conclusion that a 4000 psf load could not be supported. ComEd presented evidence from its expert that the density levels were sufficient to support the called-for foundations, and the trial court's acceptance of the testimony favoring ComEd was not against the manifest weight of the evidence.

- 7 -

¶ 26    Elston Properties contends that ComEd failed to act in good faith because it submitted improper plans after construction and caused delay at various intervals of the dispute. Accordingly, Elston Properties argues, ComEd should not get the benefit of applying the doctrines of materiality and substantial compliance. There is no indication here that the nonconformity resulted from any fraud or willfulness. Elston Properties did not prove that the deviation from the specifications was intentional. The issues regarding delay and the submission of incorrect plans were before the trial court. The trial court did not find that ComEd failed to act in good faith and it addressed the nonconformity under the standards of materiality and substantial compliance. We see no reason to adopt a different view here.

¶ 27    Elston Properties' proposed remedy in this case is that ComEd be ordered to specifically perform the breached term of the agreement, *i.e.*, dig up the vaults and substitute concrete for compacted fill in the required elevations. Elston Properties' proposed remedy would result in substantial economic waste and an unjustifiable forfeiture, especially where the current conditions satisfy the ends of the agreement.

¶ 28    The Final Order contemplates that, after construction, Elston Properties would retain the ability "to build over the ComEd facilities." But there is nothing in the agreement to suggest that the parties intended that a 30-story building would be built there. The persuasive evidence was to the contrary. While it is true that there was a "battle of the experts" on a number of the important issues in the case, the trial court's finding that Elston Properties did not prove any damage from the nonconforming work was not against the manifest weight of the evidence.

¶ 29    The trial court weighed the evidence and made a determination as to whether the breach worked to defeat the bargained-for objective of the parties (*William Blair*, 358 Ill. App. 3d at 346-47) and found that it did not. The court's determination makes clear that it found that the nonconforming construction would not cause disproportionate prejudice (or any prejudice) to the non-breaching party (*id.*). And the trial court heard expert testimony from individuals that work in the field of structural engineering to shed light on the question of whether custom and usage would consider such a breach to be material (*id.*). The ruling is not arbitrary or unreasonable, and it is based on the evidence. We may not substitute our judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn therefrom. *Tully v. McLean*, 409 Ill. App. 3d 659, 670-71 (2011).

¶ 30    Elston Properties got everything out of the contract that the contract demanded, except for Reading pipe. But as in that case, the deviation from the agreed specifications did not result in any material harm. The trial court did not commit reversible error when it issued an order of satisfaction in favor of ComEd.

¶ 31                              CONCLUSION
¶ 32    Accordingly, we affirm.

¶ 33    Affirmed.