2022 IL App (1st) 210666-U
No. 1-21-0666

FIRST DIVISION
September 6, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| 4043 S. DREXEL CONDOMINIUM ASSOCIATION, an Illinois not-for-profit corporation, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | |
| | ) | No. 18 CH 011469 |
| JOSEPH C. BURKE, an individual, GLOBAL ASSETS LLC, GLOBAL ASSETS LLC SIX, GLOBAL ASSETS LLC SEVEN, GLOBAL ASSETS LLC EIGHT, GLOBAL ASSETS LLC NINE, and DDOT4043 LLC, | ) ) ) ) ) | Honorable |
| Defendants-Appellees. | ) ) | Anna M. Loftus, Judge, presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Hyman and Justice Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The plaintiff-appellant condominium association and the defendants-appellees each filed summary judgment motions seeking declaratory relief as to (1) the validity of the plaintiff's purported 2017 election of a board of directors, (2) the validity of the plaintiff's purported amendment to the association's declaration, and (3) the validity of defendants' 2018 purported election of a different board of directors. The trial court correctly denied the plaintiff association's motion for summary judgment, as the record demonstrated the invalidity of both the association's 2017 election and the declaration amendment. We also affirm the grant of summary judgment for defendants due to plaintiff's lack of standing to maintain the action,

given the invalidity of plaintiff's purported board. We thus affirm both appealed-from orders.

¶ 2    In this dispute over control of a condominium association, plaintiff 4043 S. Drexel Condominium Association (the Association) appeals from the trial court's order denying the Association's motion for summary judgment on count I of its second amended complaint, as well as the subsequent order granting summary judgment on that count to defendants Joseph C. Burke, Global Assets LLC, Global Assets LLC Six, Global Assets LLC Seven, Global Assets LLC Eight, Global Assets LLC Nine, and DDOT4043 LLC. In the underlying motions for summary judgment, the parties sought declaratory relief regarding three issues raised in count I: (1) the validity of the Association's purported election of board members in November 2017; (2) the validity of the Association's amendment to the declaration purporting to reduce the number of board members, and (3) the validity of defendants' purported August 2018 election of board members.

¶ 3    For the following reasons, we conclude that the Association's purported board election in November 2017 was not valid because it was not properly noticed or conducted at a meeting of unit owners, as required by the Association's declaration. Similarly, the Association's purported amendment to the declaration was invalid because it was never presented in writing to the unit owners or subject to a vote. We thus affirm the trial court's September 2020 order denying summary judgment to the Association. With respect to the June 2021 order granting summary judgment to defendants, the invalidity of the Association's purported 2017 board election means the Association lacks standing to maintain the instant action. We thus affirm summary judgment for defendants on that basis, without needing to independently assess the validity of defendants' purported 2018 election of a new board of directors. We thus affirm both appealed-from orders, although our decision does not impact the ability of the condominium unit owners to raise similar claims in a derivative action.

¶ 4          BACKGROUND

¶ 5     The Association is a not-for-profit corporation whose members own residential condominium units in the 4043 S. Drexel Condominiums, a 12-unit building in Chicago. The Association was formed under a Declaration of Condominium Ownership and of Easements, Restrictions, Covenants and By-Laws for the 4043 S. Drexel Condominiums (the declaration) recorded on August 24, 2006.

¶ 6     Defendant Burke purchased a condominium unit in 2006. Burke serves as an officer and agent for the remaining corporate defendants, Global Assets LLC, Global Assets LLC Six, Global Assets LLC Seven, Global Assets LLC Eight, Global Assets LLC Nine, and DDOT4043 LLC, which have purchased a number of other condominium units. The defendants collectively own eight of the 12 units in the condominium.[1] At the time the instant litigation commenced in 2018, defendants held 49.54% of the ownership interests in the condominium. After defendants acquired an additional unit in October 2019, their collective ownership interest increased to 56.42%. Some or all of the defendants' units have been rented out by defendants to non-owner tenants.

¶ 7     Relevant Provisions of the Declaration and Bylaws Contained Therein

¶ 8     The declaration reflects that it was executed by Standard Bank & Trust Company (identified as the "Declarant") in March 2006 and was recorded with the Cook County Recorder's office on August 24, 2006. The declaration identifies the "Developer" as Queen Condominiums of 4043 S. Drexel, Inc.

---

[1] Global Assets LLC, Global Assets LLC Six, Global Assets LLC Seven, Global Assets LLC Eight, Global Assets LLC Nine are Illinois limited liability companies that own condominium units 304, 102, 201, 203, and 302, respectively. DDOT4043 LLC is an Illinois limited liability company that owns unit 303. Burke inherited unit 301 from his father Robert Burke after his death in October 2018. Burke purchased unit 103 in 2019 from its former owner, Joseph Shine.

¶ 9    The declaration states that "Articles 5 and 6 hereof shall constitute the By-Laws of the Association." The provisions in Article 5 are particularly pertinent to this appeal.

¶ 10    Section 5.1 of the declaration provides that "The direction and administration of the Property shall be vested in the Board of Directors (herein sometimes referred to as the 'Board'), which shall consist of five (5) persons who shall be elected in the manner hereinafter set forth." The same section specifies that the initial board of directors shall be chosen by the Declarant or Developer, "until the initial meeting of Unit Owners."

¶ 11    Under section 5.6, "The initial Board of Directors designated by the Declarant or Developer pursuant to section 5.1 hereof shall consist of three (3) directors." That "initial board" was to serve from the execution of declaration until the election of directors "at the initial meeting held as provided in Section 5.4(b) hereof." The record does not reflect whether the Declarant or Developer ever selected an initial board of directors.

¶ 12    Under section 5.4(b), the "initial meeting of the Unit Owners" "shall be held no later than the first to happen of (i) sixty 60 (days) after the date the Declarant has sold and delivered its deed for at least seventy-five (75%) of the Unit Ownerships or (ii) three (3) years from the date of the recording of this Declaration." Section 5.6(a) provides that "[a]t the initial meeting ***, the Voting Members shall elect the Board" that shall serve until the first annual meeting.

¶ 13    Section 5.4(b) specifies that after the initial meeting, "there shall be an annual meeting of Unit Owners" on a date that may be "may be designated by written notice of the Board delivered to the Unit Owners." Section 5.6(a) provides that "[a]t the first annual meeting five (5) Board members shall be elected."

¶ 14 Under section 5.4(c), "[s]pecial meetings of the Unit Owners maybe [sic] called at any time after the initial meeting." Section 5.4(a) also specifies that "Matters to be submitted to the Unit Owners at special membership meetings shall be submitted by the Board."

¶ 15 Section 5.6(a) elsewhere provides that "[v]acancies in the Board *** shall be filled by a vote of the Voting Members at the meeting at which such vacancy occurs, the next annual meeting or a special meeting of the Unit Owners called for such purpose." The same section states that "[a] meeting of the Unit Owners shall be called for purposes of filling a vacancy on the Board no later than (30) days following the filing of a petition signed by Voting Members with twenty (20%) of the votes of the Association requesting such a meeting."

¶ 16 History of the Association

¶ 17 Notwithstanding the provisions of the declaration, the record does not reflect whether an initial meeting of unit owners was held within 60 days after the declaration was recorded in 2006, or whether annual meetings were conducted in subsequent years. Nor does the record reflect that a five-member board of directors was ever elected by unit owners prior to the commencement of this litigation. Until 2018, only three persons (or fewer) were ever identified as "directors" at a given time.

¶ 18 In March 2008, Burke filed "Articles of Incorporation" for the Association with the State of Illinois that identified three directors: Burke, Gregg Devlin, and Karen Berge. Between 2009 and 2016, Burke caused to be filed with the State annual reports identifying himself as one of only three directors.[2] However, there is apparently no record as to when or how any directors were

---

[2] The annual reports for the years 2009 and years 2011 through 2016 identified Burke, Devlin, and Berge as directors. The 2010 annual report identified Burke, Berge, and Robert Valente as directors.

elected during this time period. According to an affidavit submitted by Priscilla Ludlow on behalf of the Association, "the Association did not maintain minutes of Member-Owner meetings or Association board meetings from the Association's inception in 2008" until 2016.

¶ 19    Origin of the Dispute Between Burke and Other Unit Owners

¶ 20    In the years preceding this litigation, conflicts arose between Burke and the other unit owners regarding management of the condominium, its finances, and Burke's rental of units he controlled to third-party tenants. Ludlow, who resided in a unit owned by her sister Benita Cathey and brother-in-law Eric Cathey, communicated with Burke regarding these issues.[3] According to an affidavit submitted by Ludlow, from 2008 and 2016, Burke "and/or his associates acquired seven of the twelve units, all for rental purposes, even though the Association's declaration limited the number of rental units allowed to four."[4] Ludlow assisted "in an effort to work with Burke to improve the management" of the condominium, as the "Association was in debt and the building's common areas were deteriorating." According to Ludlow, "[a]lthough Burke had been the President of the Association for several years, the Association held no owner meetings, conducted no owner votes, and maintained no detailed financial records other than bank statements."

¶ 21    The Purported April 2016 Election of Three Directors

¶ 22    In April 2016, Burke sent an email to Ludlow and to the other unit owners that proposed a meeting to elect a three-person board of directors. He said:

---

[3] Ludlow eventually purchased that unit from Benita and Eric Cathey in October 2018.

[4] Section 12.2 of the declaration states that "excluding those Units owned or leased by Declarant or Developer, no more than thirty nine percent (39%), in number, of either the Residential Units or Unit Parking Spaces may, in the aggregate, be leased at any given time without the prior written consent of the Board or the managing agent of the Property acting in accordance with the Board's direction."

> "[W]e have set the next owners meeting for April 23, 2016 at 11:00 a.m. in Ms. Ludlow's (unit 104). The purpose of this meeting will be to vote in the 3 members of the board. *** Once the 3 members of the board are elected, those board members will vote on the positions of President, Treasurer and Secretary each will hold."

¶ 23　The meeting apparently occurred on April 23, 2016, as the record reflects the parties' understanding that a three-person board was elected at that time. On April 25, 2016, Ludlow sent an email to Burke and Darren Doss reflecting that they had been elected as the three board members at the meeting, with Doss as "President", Burke as "Treasurer", and Ludlow as "Secretary." Ludlow indicated that they had agreed to gather financial records, including the "12-month history of assessments received [and] balances owed", the "2016 budget balance sheet", the Association's 2016 bank statements, and a "[d]etailed record of receipts and expenditures for fiscal year 2016." Ludlow requested that Burke, as Treasurer, provide those records by May 6, 2016.

¶ 24　According to Ludlow, the "relationship between Burke, [Benita and Eric Cathey] and myself deteriorated due to Burke's failure to provide complete books and records regarding the management of the Association." The record includes minutes from a "Board meeting" attended by Burke, Doss, and Ludlow on July 20, 2016. The minutes state that the attendees "expressed their desire for more transparency" from Burke as to "how the Association finances were being managed and requested detailed financial records would [sic] support a broader picture regarding the financial history of the Association from the date the Treasurer assumed authority."

¶ 25　The record reflects that by December 2016, the Association engaged counsel, who contacted Burke about providing financial records. In a December 2016 email to the Association's counsel, Burke stated: "As I discussed with your clients, the items they requested, beyond the bank

statements, do not exist." In the same email, Burke indicated that he was one of three members of the board, and he affirmatively stated that there was no prior board:

> "I am not the President and/or Secretary (nor have I been) of the association. Those positions are held by Priscilla Ludlow (Secretary) and Darren Doss (President) which I have cc'd here. I am currently the Treasurer pursuant to an initial election held earlier this year to form the association's board. The building did not have a board prior to that election."

¶ 26    The Unit Owners' Prior Derivative Lawsuit Against Burke

¶ 27    In 2017, Benita and Eric Cathey filed a derivative action against Burke and Global Assets LLC on behalf of the Association, case no. 2017 CH 5220. Other unit owners (Doss, Sheila Robinson, Ebony Tiggs, and Joseph Shine) eventually joined as plaintiffs. According to Ludlow's affidavit, the suit was based on Burke's "breach of fiduciary duty and misappropriation of Association assets." According to an affidavit submitted by Burke in the instant case, the prior lawsuit alleged that he "was not aggressive enough in collecting assessments from the delinquent owners of units that were not owned by me."

¶ 28    Ludlow and Burke Resign from the April 2016 Board

¶ 29    On June 13, 2017, Ludlow resigned as a director. On October 10, 2017, Burke sent an email to Doss stating that "[e]ffective immediately, I resign my position as treasurer on the condo board." He told Doss: "As the President and the only remaining member of the board, please notify the owners where to send their association dues going forward."

¶ 30    The November 2017 Unit Owners' Meeting

¶ 31 On October 20, 2017, Ludlow and Doss sent an email to the other condominium unit owners, including Burke, stating that an "Owners' Meeting of the 4043 S. Drexel Condominiums" would be held on November 4, 2017. The email attached an agenda which identified one of the items as "Governance and Election of Board of Directors."

¶ 32 On November 4, 2017, several members attended a meeting, either in-person or telephonically. The record on appeal contains written meeting minutes, as well as an audio recording of that meeting. The minutes to the meeting identify the "participants" as Burke, Eric and Benita Cathey, Doss, Ludlow, Shine, and Tiggs. The audio recording reflects that Ludlow moderated the meeting and that certain unit owners participated telephonically.[5]

¶ 33 Ludlow expressed the need for a "new elected board." At one point, an attendee mentioned Burke's resignation and referred to Doss as the "only board member" remaining.

¶ 34 Ludlow raised the topic of a potential amendment to the declaration to reduce the number of directors from five to three. At one point, Ludlow asked "[a]re we all in consensus" with respect to changing the number of board members. The recording indicates that a number of persons (who did not identify themselves) responded in agreement. However, the recording does not reflect that any vote was taken. A short time later, Ludlow stated there was "a formal motion" to reduce the number of elected board members to three, and Eric Cathey stated that he "second[ed]" the motion. When an unidentified person asked whether there was a need to vote on the change, Ludlow responded that if a motion is made by a member and is seconded by another member, then the Board has "final decision." Ludlow stated that Doss was the only board member, that a motion was made and seconded, and "Darren [Doss] accepted which means it's passed."

---

[5] The quality of the audio recording is poor and difficult to understand at many points, especially when persons other than Ludlow are speaking.

¶ 35    Elsewhere during the meeting, Ludlow stated that she would distribute ballots to elect board members, and that voting would remain open for a number of days.

¶ 36    The written minutes for the November 4, 2017 meeting reference the "Treasurer's resignation" and state that the "[r]emaining Board Director, Darren Doss will oversee the Association until the conclusion of the next election." The minutes also state that a "[m]otion presented to reduce the number of elected Board Members from five (5) members to three (3) members was supported and passed."

¶ 37    The November 2017 Election of Board Members

¶ 38    On the afternoon of November 4, 2017, the Association sent an e-mail to unit owners stating: "As discussed during today's Owner's Meeting, the election of the Board [of] Directors *** is now open. Please submit your candidacy for one of the three open positions on the Board by tomorrow, Sunday, November 5 at 5:00 PM."[6] The following day, the Association sent an e-mail to unit owners that attached ballots, stating that Eric Cathey and Doss were the only two candidates for the three board positions. That e-mail instructed that the election "will be closed on Friday, November 10, 2017 at 5:00 PM CT and results will be reported shortly thereafter." On November 10, the Association e-mailed owners to report that Eric Cathey and Doss were elected, as "five (5) verified and validated ballots were cast representing a 50.46% voting percentage, and both candidates received an equal percentage of votes." Thus, all unit owners other than defendants cast ballots in the November 2017 election.[7]

---

[6] The sender was identified as "4043 S Drexel Condo Assn (4043drexelcondos@gmail.com)."

[7] The record includes copies of ballots signed by Shine, Doss, Ludlow (voting by proxy for Benita Cathey) and Robinson, as well as an e-mailed ballot from Tiggs.

¶ 39    Settlement of the Prior Derivative Lawsuit

¶ 40    In February 2018, the prior derivative lawsuit against Burke (case 2017 CH 5220) was resolved under a settlement agreement, a copy of which is contained in the record.  Under that settlement, Burke and Global Assets LLC agreed to pay $40,000.[8] The settlement agreement included the parties' acknowledgment that "the current number of renters *** exceed[s] the permitted number of rental units" under section 12.2 of the declaration. The parties "agree[d] to allow all current rental units to remain as rental units" but that any new leases were subject to the "prior written consent of the Board."

¶ 41    Recording of the Amendment to the Declaration

¶ 42    The record contains minutes of a "Board Meeting" held on June 26, 2018, attended by Burke and the other unit owners. Similar to the minutes of the November 2017 meeting, the minutes for the June 2018 meeting state that a "[m]otion" to reduce the number of directors "from five (5) persons to three (3) persons [was] proposed and unanimously passed."

¶ 43    On July 27, 2018, the Association recorded an amendment to the declaration with the Cook County Recorder of Deeds that, *inter alia,* modified sections 5.1 and 5.6(a) to state that the board of directors consists of three persons. The amendment further stated that the "Current Board of Directors" had been elected in November 2017.

¶ 44    Burke Sends Notice of a Special Meeting to Conduct an Election

¶ 45    On July 23, 2018, Burke sent via certified mail a "Notice of Special Meeting of Unit Owners", addressed to each of Doss, Tiggs, Robinson, Shine, Eric and Benita Cathey at their

---

[8] At oral argument, the Association's counsel indicated the payment was intended to resolve a dispute as to defendants' alleged failure to pay assessments for units under their control.  Defendants' counsel indicated that certain units' prior owners failed to pay assessment before they were acquired by defendants.

respective units. Burke's notice stated that a meeting would be held on August 2, 2018 for the "purpose of electing a proper Board of Directors."

¶ 46 On July 31, 2018, the Association responded to Burke in an e-mailed letter, stating that his notice was "illegitimate" and non-compliant with the declaration. The Association claimed that the stated meeting purpose in Burke's notice was "factually untrue" because there "has been a legitimate, proper and duly elected Board of Directors" since November 10, 2017. The Association insisted that, under the declaration, special meetings could be called only "by written notice authorized [by] a majority of the Board, the President of the Board, or by twenty percent (20%) of the Unit Owners via a signed petition delivered to the Board of Directors." The Association emphasized that "matters to be submitted to the Unit Owners at Special Meetings MUST BE submitted to the Board FIRST." The Association also claimed that Burke's notice "was not delivered properly."

¶ 47 In the same letter, the Association accused Burke of refusing to reimburse it for expenses and damages caused by occupants of one of his rental units. According to the Association, those occupants had led to complaints of "noise and high-traffic at all hours of the day and night" and their "general rudeness and disregard of neighbors."

¶ 48 Burke Unilaterally Conducts a Special Meeting and Board Election

¶ 49 Notwithstanding the Association's response, Burke proceeded to hold a meeting and election on August 2, 2018, at which he was the only attendee. The record on appeal includes a transcript of that meeting, which reflects that it lasted nine minutes.

¶ 50 The transcript reflects that Burke identified himself as the designated officer appearing on behalf of each of Global Assets LLC, Global Assets LLC Six, Global Assets LLC Seven, Global Assets LLC Eight, Global Assets LLC Nine. Burke then stated that, "being that there are unit

owners or their proxies present having 35.32% of the association vote, the meeting has a quorum

pursuant to Section 5.4A of the Declaration."[9]

¶ 51    Burke announced that he would be conducting an election of a board of managers, and then

stated as follows:

> "I am now submitting five completed ballots and seven blank
> ballots, which will be counted. With the ballots being tabulated, the
> following *** candidates, all of whom are qualified to serve on the
> board pursuant to Section 5.1 of the Declaration *** received the
> following votes: Darren Doss, 28.44%, representing the majority
> votes of votes present, Eric Cathey, 28.44%, representing the
> majority of votes present. Joseph C. Burke, 35.32%, representing a
> unanimous vote of the quorum present. Christopher Lane, receiving
> 35.32%, representing the unanimous vote of the quorum present.
> Robert Valente, receiving *** 35.32% representing a ***
> unanimous vote of the quorum present."

Thus, according to Burke, the August 2, 2018, meeting resulted in the election of five board

members: himself, Eric Cathey, Doss, Lane, and Valente.[10]

¶ 52    On September 11, 2018, the Association's attorney, Jeffery Hagen, sent a letter to Burke

stating that "your 'new board' is not recognized by the other unit owners." Hagen further said that

---

[9] Section 5.4(a) states that the presence of "Unit Owners representing at least twenty (20%) of the Unit Ownerships shall constitute a quorum unless the Unit Owners *** provide otherwise."

[10] The Association alleges that Lane is Burke's employee. The Association alleges that Valente's former wife was a former owner of unit 301.

Burke had wrongly withheld monthly assessments due "for all seven of the units under your control."[11] Hagen's letter attached invoices for the Association's insurance and trash removal service, demanding that Burke pay them from "wrongly withheld assessments."

¶ 53    On September 12, 2018, Burke's counsel sent a letter to Doss and Eric Cathey, stating that "no board was elected in accordance with the association Declaration and Bylaws until the August 2, 2018 meeting." Burke's counsel also stated that the amendment to the declaration was unauthorized and demanded that it be undone.

¶ 54    <u>Initiation of the Underlying Action</u>

¶ 55    On September 12, 2018, the Association filed a five-count "complaint for declaratory judgment, injunctive relief, and damages" against Burke, his father Robert Burke, as well as the corporate defendants.[12] The Association pleaded that Burke lacked authority to call a meeting of unit owners to elect a new board, claiming that he "did not comply with the Declaration requirements for notice, meeting location, or board participation" for such a meeting. Among other relief, the Association sought a declaration that Burke's August 2, 2018 meeting was invalid and that Cathey and Doss were the "only duly elected members" of the board.

¶ 56    <u>The September 26, 2018 Meeting And Purported Election of a Third Board Member</u>

¶ 57    Shortly after the original complaint was filed, a meeting of unit owners was held on September 26, 2018, for which an audio recording is in the record on appeal. Ludlow stated the meeting's purpose was to "reconfirm the current board of directors" and to fill the vacant seat on the three-person board. When Burke objected, Ludlow responded that the Association had already

---

[11] Burke subsequently purchased the unit formerly owned by Joseph Shine (unit 103), such that Burke now controls eight of the twelve units in the condominium.

[12] The record reflects that Robert Burke passed away in 2018.

filed an amendment with Cook County reflecting there were now only three directors. Burke subsequently asked Ludlow if she had ballots to reflect a vote on the amendment to reduce the number of directors. Ludlow responded that there were no written ballots because a vote was not necessary for an amendment, so long as a motion was seconded and passed.

¶ 58    During the meeting, Tiggs was nominated for the vacant third board seat. Ludlow passed out written ballots, tallied the votes and stated that Tiggs was elected by votes representing 50.46% of the condominium ownership, *i.e.*, all unit owners besides defendants.

¶ 59    Burke's Board Votes to Remove the Declaration Amendment

¶ 60    On October 3, 2018, the five-person board elected by Burke held a meeting, which was also attended by Benita Cathey and Ludlow. Burke presented a motion to remove the "unauthorized recording of the amendment to the declaration." Three members of Burke's board (Burke, Lane, and Valente) voted for that motion, while Doss and Eric Cathey did not vote.

¶ 61    Subsequent Pleadings and Motions to Dismiss

¶ 62    In January 2019, defendants moved to dismiss the complaint pursuant to section 2-619.1 (735 ILCS 5/2-619.1 (West 2018)), arguing, *inter alia,* the Association lacked standing because it did not vote to authorize the litigation. On May 2, 2019, the court granted the motion but allowed the Association to file an amended complaint. After the Association did so, defendants again filed a motion to dismiss, maintaining that the Association lacked standing because it had not yet voted to authorize the matter at an open meeting. On September 30, 2019, the court dismissed the first amended complaint due to the Association's "failure to decide to pursue this litigation at a meeting called pursuant to the requirements of the Declaration." The court granted the Association leave to file a second amended complaint if it "complie[d] with the requirements of the condominium declaration and the Condominium Act."

¶ 63       Burke Elects Two New Members to His Board

¶ 64       On October 9, 2019, the Association's counsel e-mailed Burke's counsel with an offer to hold a meeting of unit owners to elect a new five-person board.  Burke did not respond. Two days later, Burke sent to all unit owners a notice of a "Special Meeting" with the stated purpose of "fill[ing] 2 expired and vacant board member positions." On October 24, 2019, Burke e-mailed to the other unit owners the minutes of a board meeting held the previous day that was not attended by any owners other than defendants. The minutes reflected that Burke, voting on behalf of five of the corporate defendants, elected Bevin O'Callghan and Peter Burke to the board, filling the slots formerly held by Doss and Eric Cathey.

¶ 65       Second Amended Complaint

¶ 66       On October 25, 2019, the Association moved for leave to file a second amended complaint, supported by an affidavit in which Ludlow specified how she notified all unit owners of a meeting to vote on whether to continue the instant litigation. The Association subsequently submitted meeting minutes reflecting that Ludlow, Doss, and Tiggs voted to authorize the instant litigation. On December 18, 2019, the court permitted the filing of the second amended complaint, but ordered that "all counts except count I are stayed pending ruling on count I."

¶ 67       The Association filed a six-count second amended complaint, although count I is the only relevant count in this appeal. In that count, the Association sought declaratory relief with respect to three issues. Specifically, the Association sought to establish (1) that the "Board elected at the November 4, 2017, owners' meetings, as changed by subsequent elections and appointments" was the duly elected board of the Association, (2) that the "Declaration Amendment reducing the number of Board members from five to three was valid" and (3) that Burke's August 2018 meeting and corresponding board election were invalid.

¶ 68    The Association Moves for Summary Judgment on Count I

¶ 69    On January 17, 2020, the Association filed a motion for summary judgment with respect to count I, supported by affidavits from Ludlow, Doss and other unit owners. In the motion, the Association requested a finding that the board elected pursuant to the November 4, 2017 meeting was the "duly elected" board, that the amendment to the declaration reducing the number of board members to three was valid, and that the August 2, 2018 meeting held by Burke was invalid.

¶ 70    In its motion, the Association claimed that, from 2008 until his resignation in October 2017, Burke was a director on the Association's three-person board, citing the annual reports submitted by Burke to the State. With respect to the purported November 2017 election, the Association urged in its motion that "[o]n November 4, 2017, the Owner-Members *** attended the Association's annual meeting and elected Eric Cathey *** and Darren Doss" to the board, leaving the "third Board position vacant." In her supporting affidavit, Ludlow stated that "following the Association's annual meeting on November 4, 2017, Darren Doss and Eric Cathey were elected by written ballot to the Board" and she was appointed by them to "act as Secretary."

¶ 71    Regarding the amendment to the declaration, the Association contended that it was valid because the unit owners "unanimously voted to amend the Declaration to reduce the number of directors" to three. Ludlow's supporting affidavit attested that during the November 4, 2017 meeting "the owners authorized the Board to amend the Declaration to reduce the number of Directors from five to three." In a supporting affidavit by Tiggs, she similarly averred that "[a]ll the owners" at the November 4, 2017 meeting, including Burke, "agreed to reduce the number of Board members from five to three."

¶ 72    With respect to the claimed invalidity of Burke's August 2018 meeting and election, the Association averred that Burke lacked authority to unilaterally call a meeting of unit owners to

elect a new board. The Association claimed that, under section 5.4(c) of the declaration, Burke was required "to submit any matters to be voted on by the Owner-Members to the Board for presentment to the Owner-Members." The Association similarly argued that, under section 5.6 of the declaration, a "petition" to the board is required before a unit owner may call such a meeting. In his supporting affidavit, Doss averred that Burke never submitted such a petition.

¶ 73     The Association separately urged that Burke's August 2, 2018 meeting was otherwise invalid because Burke did not give proper notice to all of the unit owners when he mailed notices to each of the condominium units. Specifically, the Association claimed that the owners of two units "had on file addresses for purposes of service other than the unit address," but Burke did not send notice to those addresses.

¶ 74     On April 30, 2020, defendants filed their response to the motion. Defendants disputed the validity of the November 2017 election and the amendment to the declaration on a number of procedural grounds, while maintaining that the 2018 board election conducted by Burke was legitimate.

¶ 75      Defendants indicated their position that there was no legitimate board prior to Burke's election. In a supporting affidavit, Burke claimed the "developer abandoned the association and stopped collecting assessments and paying bills [in] late 2007 and into early 2008." Burke acknowledged that in March 2008, he filed "Articles to form a not-for-profit corporation for the Association" "in hopes to formalize an initial board of managers." However, he "was unable to get the unit owners to meet to elect a board of managers." According to Burke, "[f]rom 2008 through 2017 there was at no time an Owners Meeting of the Association to elect a board of managers." Burke stated he "was not elected as a board member by the Unit Owners at any Unit Owners Meeting from 2006 until the meeting held on August 2, 2018."

¶ 76    Burke acknowledged that he attended the November 4, 2017 meeting after receiving an e-mail from Ludlow. However, he averred that no notice was sent by certified mail to any of the unit owners, as required by the declaration. He also attested that although Ludlow stated that she would distribute ballots, no election occurred at the meeting. Burke averred that the Association never adopted a rule permitting the election of board members by electronic means.

¶ 77    Regarding the purported amendment, Burke acknowledged that during the November 4, 2017 meeting, there was discussion of a "motion" to reduce the number of directors.  However, Burke denied there was any vote to amend the declaration. A copy of the audio recording from that meeting was included as an exhibit to Burke's affidavit.

¶ 78    Burke also acknowledged he received an e-mailed notice of a meeting to occur on June 26, 2018, but it did not include a written copy of any proposed amendment. Burke participated in that meeting by telephone, but he averred that no vote to amend the declaration was taken. Burke maintained that the August 2018 meeting he conducted resulted in the election of a "five-person legitimate board."

¶ 79    On September 18, 2020, the court heard argument on the Association's motion for summary judgment on count I.  Regarding the validity of the November 2017 meeting and election, the court asked the Association to respond to defendant's argument that e-mailed notice of the meeting was insufficient. The Association's counsel did not argue that electronic notice was permitted, but instead pointed out that Burke used e-mail to call meetings in 2016. The court commented that "[t]he fact that Mr. Burke sent e-mail notice does not meant that e-mail notice is proper going forward."

¶ 80    Regarding the validity of the amendment to the declaration, the Association counsel argued that unit members did not need to be presented with "the actual written document" before they

approved it. The court disagreed, indicating it interpreted section 13.7 of the declaration to mean that an amendment must be presented to the owners in writing before a vote.

¶ 81    Later during argument, the Association's counsel claimed that the audio recording of the November 4, 2017, meeting reflected that everyone, including Burke, agreed when Ludlow asked if there was a "consensus" to reduce the number of board members. Counsel claimed the recording showed that Burke voted in favor of the amendment, because "[h]e's sitting there and doesn't say a word." The court disputed this, noting that the recording did not reflect that unit owners' votes were tallied and that there was "no evidence" that Burke affirmatively voted.

¶ 82    With respect to the amendment, defendants' counsel urged the record reflected no actual vote, but merely a motion that was seconded. Defendants' counsel otherwise argued that under section 13.7, the "instrument in writing has to be approved" but no written amendment was presented at the November 2017 meeting.

¶ 83    Regarding the validity of Burke's August 2018 meeting and election, the Association's counsel argued that the meeting was invalid because, under section 5.4(c) of the declaration, he had to first inform the board of the purpose for the meeting. The Association also argued that Burke did not properly give notice because two owners, Eric Cathey and Shine, did not live at the units they controlled.

¶ 84    Defendants' counsel argued that under the declaration, Burke was authorized to call for a special meeting because he had more than the requisite 20% ownership. Defendants urged that Burke sent proper notice of the August 2018 meeting "in accordance with the declaration", although the other unit owners decided not to attend.

¶ 85    At the conclusion of the hearing, the court stated that it would deny the Association's summary judgment motion "on all three requests." With respect to whether the November 2017

election was valid, the court pointed out that notice was sent by e-mail, yet there was "no evidence presented that there was a rule or regulation that was adopted *** to allow for e-mail notice." The court noted that the Illinois Condominium Property Act (Act) permitted the Association to specifically adopt a rule authorizing electronic notice, but there was no showing it had done so.

¶ 86    With respect to the validity of the amendment, the court interpreted section 13.7 of the declaration to mean that "[t]he instrument itself, the written instrument must be approved" by the unit owners having at least 67 percent of the total vote. The court remarked that it did not appear that a written amendment was presented to the owners, and that there was a factual issue as to whether 67% of the ownership voted to approve it.

¶ 87    The court then explained why it would not grant summary judgment to the Association with respect to its claim that Burke's August 2018 meeting and board election were illegitimate. The court said "it appears that his calling of the meeting was appropriate, as he had 20 percent of the ownership interest." The court also found that the Association had not submitted evidence establishing that any unit owners were not properly notified. As to the issue of whether matters to be discussed at a special meeting must first be submitted to the board, the court remarked that the issue had not been "argued sufficiently." The court commented that the phrase "submitted by the board" in section 5.4 could be a "term of art" but the parties had not argued its precise meeting, *e.g.*, whether it means that the board must "put[] it all together in a document and sends it to everybody, or puts it on the agenda."

¶ 88    Thus, on September 18, 2020, the court denied the Association's motion for summary judgment on count I of the second amended complaint.

¶ 89    <u>Burke Re-Elects Three Members of His Board</u>

¶ 90    On September 30, 2020, Burke sent notice to unit owners of a special meeting to be held on October 12, 2020, to fill three expiring board member positions from the five-member board previously elected by Burke. The meeting minutes reflect that Burke, Valante, and Lane were re-elected to the board with the support of 56.42% of the ownership, with all votes being cast by Burke on defendants' behalf.  Thus, according to defendants, the five-member board as of October 2020 consisted of Burke, Peter Burke, Bevin O'Callaghan, Valante, and Lane.

¶ 91    Defendants Move for Summary Judgment on Count I

¶ 92    On October 16, 2020, defendants filed a motion for summary judgment on count I, asserting they were entitled to declaratory relief that (1) the board elected in November 2017 was not duly elected; (2) the amendment to the declaration was not valid, and (3) the five-member board elected by Burke at the August 2018 meeting was the valid board. Defendants submitted another affidavit from Burke in support of that motion.

¶ 93    Defendants asserted the November 2017 election was not valid for a number of reasons. Among these, defendants urged that the notice for the November 4, 2017 meeting was defective because it was sent by e-mail, whereas section 13.2 of the declaration calls for certified mail. Defendants argued there was no written authorization from any unit owners to conduct business by e-mail. In his supporting affidavit, Burke averred that no notice of the meeting had been sent by certified mail and that he had never authorized "electronic delivery of notices". Defendants similarly urged that the declaration "makes no provision for voting by electronic transmission" and that the Association did not pass a rule to allow electronic voting, pursuant to section 18(b) of the Act. 765 ILCS 605/18(b)(9)(B-5) (West 2016).

¶ 94    Defendants separately asserted that the purported amendment to the declaration was invalid, as it had not been presented to unit owners or voted on. In his supporting affidavit, Burke

averred that no amendment was ever presented for approval of the unit owners. Burke acknowledged there was discussion of a "motion" at the November 4, 2017 meeting, but he stated "[a]t no time was any vote taken" to approve the amendment. Burke also noted that at the September 26, 2018 meeting, Ludlow told him that no vote was necessary for an amendment if a "motion" was passed.

¶ 95    Defendants' summary judgment motion also sought declaratory relief affirming the validity of the August 2, 2018 board election conducted by Burke, as well as the successor board elected in October 2020. In his supporting affidavit, Burke attested he sent notices of the August 2018 election to each unit owner's address, in accordance with the declaration. He also attested that the Association had not produced records showing that any owners had "designat[ed] an address other than their unit address for service of notices" of meetings. Burke averred he had properly noticed the elections held in October 2019 and October 2020, attaching corresponding notices and meeting minutes.[13]

¶ 96    On May 24, 2021, the court heard argument on defendants' summary judgment motion, indicating that it would grant the motion in all respects. In doing so, the court remarked that the Association raised "no legitimate response" to defendants' argument that the Association's November 2017 election was improper. The court concluded that the board elected in November 2017 was "not validly elected." With respect to the amendment, the court referenced its previously stated reasoning and concluded the amendment was void and should be released from title.

---

[13] Burke attested that the current board consisted of O'Callaghan and Peter Burke (elected to two year terms in October 2019), as well as Valente, Lane, and himself, who were elected to two-year terms in October 2020.

¶ 97     The court proceeded to find that Burke's August 2018 meeting and election were valid, noting that Burke sent notices by certified mail to each of the unit owners. The court noted that the Association failed to provide documentation to support its claim that notices were not sent to the proper addresses for two unit owners. The court proceeded to agree that the board elected by Burke at the August 2018 meeting was "legitimate" and that the five-member board pursuant to the October 12, 2020 election was the "legitimate current board."

¶ 98     Furthermore, having concluded that the November 2017 board election was invalid, the court stated it would dismiss the remaining counts of the Association's action due to lack of standing:

> "Now that I've declared Burke's board to have to be the legitimate
>
> board, the old board has no standing to pursue these claims. That
>
> does not mean that the old board cannot bring derivative claims. Any
>
> of the members of it could bring derivative claims, obviously. But
>
> I'm dismissing the remainder of the 2018 case for lack of standing
>
> by the old board, since it was not validly constituted."

¶ 99     On June 1, 2021, the court entered a written order granting defendants' motion for summary judgment on count I. The court declared that "the Board of Darren Doss and Eric Cathey elected following the November 4, 2017 meeting was not validly elected." The court also found that the recorded amendment to the declaration "was not validly adopted, is void and shall be released from the title" through a memorandum recorded on the title of each unit. The court further declared that the board elected at the August 2, 2018 meeting conducted by Burke "constituted the board of the [Association] pursuant to that election." The order further specified that "the current

board elected at the October 12, 2020 election consisting of Bevin O'Callaghan, Peter Burke, Joseph Burke, Robert Valene and Christopher Rocky Lane constitutes the current board."

¶ 100    In the same order, the court dismissed counts II through VI of the Association's second amended complaint "with prejudice for lack of standing" given its ruling on count I.

¶ 101    On June 9, 2021, the Association filed a notice of appeal, specifying that it sought to appeal the September 18, 2020 order denying the Association's motion for summary judgment, as well as the order of "June 6 [sic], 2021, granting Defendants' Motion for Summary Judgment on Count I of Plaintiff's Second Amended Complaint." On July 1, 2021, the Association filed an amended notice of appeal, which was identical except that it corrected the date of the second appealed-from order to "June 1, 2021."

¶ 102    ANALYSIS

¶ 103    On appeal, the Association seeks reversal of (1) the September 2020 denial of the Association's motion for summary judgment on count I of the second amended complaint, and (2) the June 2021 order granting defendants' motion for summary judgment on count I and dismissing the remaining counts due to lack of standing.

¶ 104    For the following reasons, we first affirm the denial of the Association's motion for summary judgment in its entirety. With respect to the first two issues raised by count I, the Association did not establish that it was entitled to summary judgment establishing the validity of the board purportedly elected in November 2017, or the validity of the amendment to the declaration. Further, the Association does not challenge the denial of its motion for summary judgment with respect to the claimed invalidity of the board purportedly elected by Burke in August 2018.

¶ 105    With respect to the June 2021 order granting summary judgment to defendants, we affirm because the evidence clearly shows that the Association's November 2017 board  election did not comply with the governing procedures of the declaration, rendering the resulting board invalid. In turn, the Association was not duly authorized to maintain the instant action, requiring dismissal of the action due to lack of standing. As defendants were entitled to summary judgment for that reason, we affirm the June 2021 order without specifically deciding whether the defendants otherwise established that the amendment was invalid, that Burke's 2018 election complied with the declaration, or that the successor board elected by defendants was legitimate. Such issues might be appropriately raised by unit owners in a properly filed derivative action, but we need not decide them to affirm the appealed-from orders.

¶ 106    Standard of Review

¶ 107    "Summary judgment is appropriate only where 'the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Carney v. Union Pacific R.R. Co.*, 2016 IL 118984, ¶ 25 (quoting 735 ILCS 5/2-1005(c) (West 2012)). "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Seymour v. Collins*, 2015 IL 118432, ¶ 42. An appeal from grant of summary judgment is subject to *de novo* review. *Id.* We also keep in mind that "we review only the court's ultimate judgment, not its reasoning in support of that judgment." *Jarosz v. Buona Companies*, LLC, 2022 IL App (1st) 210181, ¶ 29 (citing *Makowski v. City of Naperville*, 249 Ill. App. 3d 110, 115 (1993)). Accordingly, "we may affirm the trial court's grant of summary judgment on any ground apparent from the record." *Catom Trucking, Inc. v. City of Chicago*, 2011 IL App (1st) 101146, ¶ 9 (quoting *Fan v. Auster Co.*, 389 Ill. App. 3d 633, 648 (2009)).

¶ 108 Although the Association asserts many arguments, the propriety of the underlying summary judgment orders turn on whether there was a genuine issue of material fact as to the three propositions alleged in count I: (1) the validity of the November 2017 board election, (2) the validity of the amendment to the declaration, and (3) the validity of the board election conducted by Burke in August 2018. These issues implicate the Act, the declaration, and the bylaws contained in section 5 therein.

¶ 109 "Condominiums are creatures of statute and, thus any action taken on behalf of the condominium must be authorized by statute." *Alliance Property Management, Ltd., v. Forest Villa of Countryside Condominium Ass'n*, 2015 IL App (1st) 150169, ¶ 27. "Where a unit owner's rights must be determined, the Act, the declaration, and the bylaws must be construed as a whole. [Citation.] This concept similarly applies where the court must determine the scope of a condominium board's authority because the same rights and obligations are implicated." *Id.*

¶ 110 "Pursuant to the Act, a condominium is formed by the recording of a declaration. [Citation.] The declaration is 'the instrument by which the property is submitted to the provisions of [the] Act. [Citations.]" *Id.* "The declaration is the contract between the association and the unit owners governing the operation of the condominium property and association and sets forth the board's duties related to management of the property and association." *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 2014 IL App (1st) 111290, ¶ 75.

¶ 111 "In addition to the declaration, the administration of a condominium is governed by the board rules and regulations and the bylaws." *Alliance*, 2015 IL App (1st) 150169, ¶ 27. "The general contents of both the declaration and the bylaws are delineated by the Act." *Id.* "As long as the requirements of the Act are followed, a board may impose additional rules in its declaration and bylaws. [Citations.]" *Id.* ¶ 30. "A board must strictly comply with the bylaws." *Id.* ¶ 33.

¶ 112   The general principles of contract interpretation apply to interpretation of a declaration. See *Palm*, 2014 IL App (1st) 111290, ¶ 75. If the declaration's language is clear and unambiguous, it "should be given its plain and ordinary meaning and the contract enforced as written. [Citation.]." *Id*. The interpretation of the declaration "is a question of law and may, therefore, be decided on a motion for summary judgment. [Citation.]" *Id*.  If there are no disputed issues of material fact, interpretation of the declaration is *de novo*. See *Goldberg v. Astor Plaza Condominium Ass'n* , 2012 IL App (1st) 110620, ¶ 48 (since "there are no disputed questions of material fact, we may properly address *de novo* the issue of whether the declaration authorized the board to approve [unit owner's] window renovation. [Citation.]") With these principles in mind, we first address whether the court correctly denied the Association's motion for summary judgment on each of the issues raised by count I.

¶ 113   <u>The Association Was Not Entitled to Summary Judgment With Respect to the Validity of the Purported November 2017 Board Election Because It Was Not Conducted at a Meeting</u>

¶ 114   We first conclude the trial court properly denied summary judgment to the Association, insofar as it sought a declaration with respect to the validity of the board election conducted in November 2017. The record did not show that the Association was entitled to judgment as a matter of law on that issue. To the contrary, it is clear from the record that the November 2017 election was invalid for a simple reason: it was not conducted by a vote of owners at a meeting, as required by the declaration and bylaws contained therein.

¶ 115   Section 5.6(a) of the declaration unambiguously requires board members to be elected at a meeting. It provides that an initial three-member board shall be "elected at the initial meeting" and that five board members shall be elected "[a]t the first annual meeting." The same provision calls for vacancies to be filled by voting *at meetings*:

"Vacancies in the Board *** shall be filled *by a vote of the Voting Members at the meeting* at which the vacancy occurs, the next annual meeting or a special meeting of the Unit Owners called for such purpose. Vacancies may also be filled by the Board by a two-thirds (2/3) vote of the remaining members thereof at a special meeting of the Board which vacancy shall be filled until the next annual meeting of the Unit Owners or for a period terminating no later than thirty days following the filing of a petition signed by Voting Members holding twenty (20%) percent of the vote of the Association requesting a meeting of the Unit Owners to fill the vacancy for the balance of the term." (Emphasis added.)

¶ 116   Although the declaration clearly requires that unit owners elect board members "at" a meeting, here the record shows (and the Association does not dispute) that Ludlow and the unit owners used a different procedure. There was no election conducted at the November 4, 2017 meeting. Instead, Ludlow sent ballots to unit owners via e-mail and requested that they be returned by November 10, 2017. The results were tabulated and announced several days after the meeting. This simple fact precluded summary judgment for the Association, insofar as count I of the second amended complaint sought a declaration that the November 2017 election was valid.

¶ 117   We recognize that the Act permits an association to adopt procedures for voting in board elections by electronic means. 765 ILCS 605/18(b)(9)(A) (West 2016) ("to the extent the condominium instruments or rules adopted thereunder expressly so provide, a vote or proxy may be submitted by electronic transmission"); see also 765 ILCS 605/18.8(d) ("Voting on *** any matter under any condominium instrument or any provision of this Act may be accomplished by

any acceptable technological means"). If the association elects to allow electronic voting in its declaration, bylaws or rules, "instructions regarding the use of electronic means for voting shall be distributed to all unit owners not less than 10 and not more than 30 days before the election meeting." 765 ILCS 18(b)(9)(B-5) (West 2016)).

¶ 118   However, the record contains no declaration amendment or bylaws that specifically allowed board members to be elected through electronic distribution or submission of ballots.  Nor is there documentation showing that instructions regarding electronic voting were distributed between 10 and 30 days before the meeting. For this reason alone, the purported November 2017 election was not valid.

¶ 119   Electronic Notice of the November 2017 Meeting Was Not Authorized

¶ 120   Even if the Association's purported election could be construed as having occurred "at" the November 4, 2017 meeting, it would otherwise be invalid because it was not properly noticed. Specifically, the Association made no showing that e-mailed meeting notice was permitted by the declaration or bylaws. Indeed, at oral argument the Association's counsel conceded that the Association never authorized this manner of notice in a rule or bylaw. This is an independent reason to affirm the trial court's denial of summary judgment to the Association with respect to the November 2017 board election.

¶ 121   In this regard, we note that section 5.5 of the declaration calls for notices of meetings of Unit Owners to be "*delivered either personally or by mail* to the designated Voting Members, addressed to each such person at the address given by the Unit Owner to the Board for the purpose of service of such notice, or to the Unit of the Unit Owner with respect to which such voting right appertains, if no address has been given to the Board by the Voting Members." (Emphasis added.) Section 5.5 provides "a notice shall be deemed 'delivered' upon compliance with the notice

provision set forth in section 13.2 hereof." In turn, section 13.2. of the declaration contemplates that notices shall be mailed or personally delivered to Unit Owners:

>"Notices provided for in this Declaration and in the Act to be given to the Board or Association shall be in writing and addressed to the Unit address of each member of the Board or at such other address as otherwise provided herein. Notices \*\*\* shall be in writing and addressed to the Unit address of said Unit Owner, or at such other address as otherwise provided herein, including, without limitation, in Section 5.5 hereof. Any Unit Owner may designate a different address or addresses for notices to him by giving written notice of his change of address to the Board or Association. Notices addressed as above shall be deemed delivered when mailed by United States registered or certified mail or when delivered in person with written acknowledgement of the receipt thereof, or, if addressed to a Unit Owner, when deposited in his mailbox at such address as is designated pursuant hereto."

¶ 122   The Association certainly had discretion under the Act to adopt rules allowing notice of a meeting to be sent electronically. 765 ILCS 605/18(b)(6) (West 2016) (requiring an association's bylaws to provide "that written notice of any membership meeting shall be mailed or delivered giving members no less than 10 and no more than 30 days notice of the time, place and purpose of such meeting *except that notice may be sent, to the extent the condominium instruments or rules adopted thereunder expressly so provide, by electronic transmission consented to by the unit owner to whom the notice is given,* provided the director and officer or his agent certifies in writing

to the delivery by electronic transmission." (Emphasis added); see also 765 ILCS 605/18.4(s) (West 2016) (specifying that the board of managers has the power to adopt rules and regulations "authorizing electronic delivery of notices *** required or contemplated by this Act to each unit owner who provides the association with written authorization for electronic delivery"). However, the Association made no showing that any bylaws or rules expressly permitted electronic notice of membership meetings. Rather, under the section 5.5 of declaration, notice needed to be "delivered either personally or by mail."

¶ 123   In its brief and at oral argument, the Association admitted that the November 4, 2017 meeting was noticed through e-mail and that this form of notice did not comply with the declaration. However, it raises two arguments as to why this should not invalidate the November 2017 board election. The Association first argues that as a matter of "fiduciary estoppel", Burke cannot complain about the use of e-mail because he previously sent e-mail notice of unit owner meetings, including the April 2016 election, while acting as a director. The Association thus claims Burke is "estopped from denying his consent to email communications."

¶ 124   The lone case cited by the Association for this argument is *Cohn v. Receivables Finance Co.,* 123 Ill. App. 2d 224 (1970), which has nothing to do with condominium governance. *Cohn* concerned a suit to enforce repayment of a loan to defendant. The defendant borrower was the plaintiff's attorney when he asked plaintiff to loan him a sum of money, suggesting that he would pay her interest at the rate of 10 percent per annum. *Id.* at 226. Defendant prepared the note and made payments of interest at 10 percent for approximately 25 years, before he asserted a defense of usury. *Id.* at 226-27. The trial court found the loan was usurious and granted summary judgment to defendant. On appeal, however, our court found that defendant was estopped from raising the defense of usury, noting that he suggested the terms of the loan as well as "the critical factor of

defendant's clear fiduciary responsibility to plaintiff as her attorney presented an even more persuasive reason for the working of such an estoppel." *Id.* at 227. Thus, defendant was "required to perform the contract as he drew it." *Id.* at 231.

¶ 125    Clearly, *Cohn* is factually inapposite to the situation at hand. The Association cites no authority suggesting that "fiduciary estoppel" prevents a condominium unit owner from asserting that the Association's conduct was not authorized by its declaration or bylaws, even if that individual did not comply with them in the past. Regardless of Burke's prior use of email, it is undisputed that the declaration simply does not authorize notice through electronic means. And while the Association could have expressly authorized such notice, there is no showing that it ever did so. We thus reject the Association's "fiduciary estoppel" argument.

¶ 126 The Association alternatively argues we should excuse the e-mailed notice of the November 2017 meeting, based on its interpretation of section 18.8 of the Act. Specifically, it contends that section 18.8(f) of the Act was "directory" rather than "mandatory." However, the Association's reliance on section 18.8 is unavailing in light of other provisions of the Act.

¶ 127    Section 18.8(a) provides that "[a]ny notice required to be sent or received or signature, vote, consent or approval required to be obtained under any condominium instrument or any provision of this Act may be accomplished using acceptable technological means. This Section shall govern the use of technology in implementing the provision of any condominium instrument or any provision of this Act concerning notices, signatures, votes, consents or approvals." 765 ILCS 605/18.8(a) (West 2018). Section 18.8(f) provides that "[i]f any person does not provide written authorization to conduct business using acceptable technological means, the association shall, at its expense, conduct business with the person without the use of acceptable technological means." 765 ILCS 605/18.8(f) (West 2018).

- 33 -

¶ 128   The Association argues that section 18.8(f) was not "compulsory" but was merely "directory," such that literal compliance is not required so long as the "spirit of the law" is not violated. The Association proceeds to argue that its use of email notice for the November 2017 meeting did not violate the spirit of the section 18.8(f) with respect to Burke, as the statute is intended to protect unit owners who lack technological capabilities. The Association argues that section 18.8(f) is not intended to allow a "disgruntled" owner with e-mail capability "to retroactively negate actions" by the Association "simply by claiming, after the fact, that he did not give written authorization to receive electronic communication."

¶ 129   As the Association points out, this court has discussed whether certain provisions of the Act are mandatory or discretionary. See *Goldberg*, 2012 IL App (1st) 110620, ¶¶ 35-43 (examining provision that "[a]ny member who prevails in an enforcement action to compel examination of the records *** shall be entitled to recover attorney's fees and costs from the association" (765 ILCS 605/19 (West 2006)) and determining that it was mandatory). However, we need not decide whether section 18.8(f) of the Act is mandatory or discretionary, as it does not govern the question of whether e-mail notice for the November 2017 meeting was permitted. Instead, section 18(b)(6) more particularly specifies the requisite form of notice for meetings. 765 ILCS 605/18(b)(6) (West 2016). We keep in mind that "specific statutory provisions will control over general provisions on the same subject." *Van Dyke v. White*, 2019 IL 121452, ¶ 46 (quoting *People ex rel. Madigan v. Burge,* 2014 IL 115635, ¶ 31). Whereas section 18.8 generally applies to "the use of technology in implementing the provisions of any condominium instrument or any provision of this Act concerning notices", 765 ILCS 605/18.8(a), section 18(b)(6) more particularly specifies that meeting notices "shall be mailed or delivered" unless "condominium instruments or rules" expressly provide for notice by electronic transmission. 765 ILCS 605/18(b)(6) (West 2016). The

Association concedes that it did not pass any rule specifically authorizing electronic notice for unit owner meetings. To the contrary, section 5.5 of the declaration requires notices of unit owner meetings to be "delivered either personally or by mail." Under sections 5.5 and 13.2, notices are "deemed delivered" if "mailed by United States registered or certified mail or when delivered in person *** or, if addressed to a Unit Owner, when deposited in his mailbox." The Association cannot avoid these explicit notice requirements.

¶ 130   In short, the e-mail notice implemented for the November 4, 2017 meeting was simply not authorized by the Association's own governing documents. Thus, even if the election could be construed as having occurred "at" the meeting (which it clearly was not), the Association did not demonstrate that it gave proper notice of that meeting. Accordingly, we affirm the trial court's denial of summary judgment to the Association with respect to the portion of count I seeking a declaration that the November 2017 board election was valid.

¶ 131   The Trial Court Properly Denied Summary Judgment to the Association With Respect to the Validity of the Amendment to the Declaration

¶ 132   We turn to the trial court's denial of the Association's motion for summary judgment with respect to the second issue in count I, namely, the validity of the amendment to the declaration that purportedly reduced the number of board members from five to three. We conclude that the Association failed to demonstrate that the amendment was approved in compliance with section 13.7 of the declaration. Thus, the trial court also properly denied summary judgment to the Association on this issue.

¶ 133   The record makes clear that the amendment was procedurally invalid for two reasons. First, as noted by the trial court, there is no dispute that the proposed amendment was *not* presented in

writing to the unit owners, contrary to section 13.7. More fundamentally, the record does not show that any vote of unit owners was taken, as explicitly required by that provision.

¶ 134   Section l3.7 of the declaration provides, in relevant part:

> "The provisions of Article 11 and Sections 10.2, 13.12 and the following provisions of this Section 13.7 may be changed, modified or rescinded by an instrument in writing setting forth such change *** signed and acknowledged by the President or a Vice President of the Board and by all of the Unit Owners and all First Mortgagees. Other provisions of this Declaration may be changed, modified or rescinded *** *by an instrument in writing setting forth such change, modification, or rescission signed and acknowledged by the President or a Vice-President of the Board, and approved by the Unit Owners having, in the aggregate, at least sixty-seven (67%) of the total vote, at a meeting called for that purpose ***.*" (Emphasis added).

¶ 135   Here, the purported amendment sought to modify portions of article 5 of the declaration. The parties agree that the procedure for such an amendment is governed by section 13.7's sentence referring to an "instrument in writing setting forth such change, modification, or rescission", but they disagree as to whether that provision's requirements were satisfied under the record in this case.

¶ 136   The Association acknowledges that the language of the proposed amendment was not presented in writing to unit owners for approval, but it argues there was no need to do so. The Association points out that section 5.7(f)(viii) of the declaration specifies that notice of proposed

rules and regulations must contain the "full text" of such proposed rules, whereas section 13.7 does not use the same "full text" phrase with respect to modifications to the declaration. The Association proceeds to suggest that because an amendment to a declaration may be "more complex" than a rule or regulation, it need not be presented in writing since "getting all owners to read and approve the final text could be unachievable." According to the Association, the amendment at issue was valid because "a meeting was held, a vote was taken, and an amendment was prepared and filed," regardless of whether unit owners had an opportunity to review the written amendment.

¶ 137   The Association's argument is without merit, as it defies the plain language of section 13.7. The pertinent sentence specifies the declaration may be changed "*by an instrument in writing* setting forth such change, modification, or rescission signed and acknowledged by the President or a Vice-President of the Board, *and approved by the Unit Owners* having, in the aggregate, at least sixty-seven (67%) of the total vote at a meeting, at a meeting called for that purpose." (Emphases added). As the trial court recognized, this means the amendment must be reduced to an "instrument in writing" that is both "signed" by the president and vice president and "approved" by the requisite number of unit owners. Clearly, an "instrument in writing" cannot be "approved" by unit owners if they lacked an opportunity to review the specific proposed language. The Association's admitted failure to present the proposed amendment in writing independently precluded its motion for summary judgment seeking a declaration of the amendment's validity.

¶ 138   <u>The Association Did Not Show the Amendment Was Subject to a Vote</u>

¶ 139   Even if we were to agree that the unit owners did not need to review the written amendment, the Association could not establish the amendment's validity for a more fundamental reason: the record does not show that any vote was taken to approve it. The Association certainly did not show

that the amendment received the support of "Unit Owners having at least sixty-seven (67%) of the total vote" as required by section 13.7 of the declaration.

¶ 140   We note that the Association's briefing contradicts itself as to whether a vote occurred, and as to whether Burke's silence indicated that he supported the amendment. Within the same paragraph, it asserts that "a vote was taken" at the November 4, 2017 meeting, but then suggests that Burke impeded completion of a vote: "The trial court found that the audio recording did not demonstrate a proper vote, however, an equally plausible conclusion is that the audio recording showed a volunteer board's good faith efforts to take a vote while an owner totally lacking in good faith sits quietly by." In its reply brief, the Association suggests that Burke's silence when Ludlow asked if there was a "consensus" should be interpreted as his acquiescence to the amendment: "All Burke had to do was speak up. He did not." The Association maintains that "a vote was taken, but that Burke remained silent." Indeed, the Association claims that "the audio recording evidences a unanimous vote" in favor of the amendment.

¶ 141   The Association's suggestion that the unit owners voted on the amendment is refuted by the record. The audio recording of the November 4, 2017 meeting makes clear that no vote was ever attempted with respect to the amendment. Instead, Ludlow stated her belief that an amendment merely required a "motion" to be raised and seconded. Similarly, the written minutes of that meeting did not reflect that any vote was taken but stated that a "[m]otion *** to reduce the number of elected Board Members from five (5) members to three (3) members was supported and passed." Furthermore, Ludlow confirmed there was no vote on the amendment during the subsequent meeting on September 26, 2018. On that date, when Burke questioned whether there were ballots to reflect the amendment reducing the number of board members, Ludlow responded

there were none. She then reiterated her belief that an amendment did not require a vote, but merely required a motion.

¶ 142    In sum, the record makes clear that there was no written amendment presented or voted on, contrary to the explicit requirements of section 13.7. In turn, we agree with the trial court that the amendment purporting to reduce the number of directors was unauthorized and is void. We thus affirm the denial of the Association's motion for summary judgment, insofar as it sought a declaration with respect to the validity of the amendment.

¶ 143    The Association Does Not Challenge the Denial of Its Motion For Summary Judgment
Regarding the Validity of Burke's August 2018 Election

¶ 144    In addition to denying the Association's motion for summary judgment with respect to the November 2017 election and the amendment, the trial court's September 18, 2020 order also denied the Association's motion for summary judgment on count I, insofar as it sought a declaration of the invalidity of the election conducted by Burke on August 2, 2018.

¶ 145    Notably, however, the Association's appellate brief does not challenge this aspect of the trial court's September 18, 2020 order. That is, the Association does not specifically contend that the trial court erred in declining to grant it summary judgment on that particular aspect of count I. The Association has thus forfeited any argument that it was entitled to summary judgment declaring Burke's election invalid. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued [in the opening brief] are forfeited and shall not be raised in the reply brief, in oral argument, or on a petition for rehearing.") We thus affirm in its entirety the September 18, 2020 order denying the Association's motion for summary judgment on count I.

¶ 146    The Trial Court Properly Granted Summary Judgment to Defendants as to the Invalidity
of the November 2017 Board Election

¶ 147   Having affirmed the denial of the Association's summary judgment motion, we turn to the propriety of the trial court's June 2021 order, which granted defendants' summary judgment motion on count I of the second amended complaint and dismissed the remaining counts due to lack of standing. We first conclude that the trial court correctly granted summary judgment to the defendants as to the invalidity of the purported board election following the November 4, 2017 meeting. That is, the record clearly established that the November 2017 election was not conducted in a manner authorized by the declaration.

¶ 148   We reach this conclusion for the same reasons we have discussed in affirming the denial of the Association's motion for summary judgment regarding the November 2017 board election. As explained above, the record clearly establishes that the purported election was not conducted at a meeting, as required by the declaration. Instead, ballots were electronically distributed after the November 4, 2017 meeting, and votes were submitted and counted over the next several days. Although the Act permitted the Association to pass a rule authorizing the electronic transmission of votes, it is undisputed that the Association did not do so. See 765 ILCS 605/18(b)(9)(A) (West 2016) ("to the extent the condominium instruments or rules adopted thereunder expressly so provide, a vote or proxy may be submitted by electronic transmission").

¶ 149   Further, as previously discussed, the undisputed facts make clear that the November 4, 2017 unit owners' meeting was not noticed in compliance with the declaration. Notices of that meeting were distributed by e-mail, whereas section 5.5 specifies that notices of meetings of unit owners are to be "delivered either personally or by mail." Section 5.5 further states that a notice is "deemed 'delivered' upon compliance with the notice provision set forth in section 13.2 hereof." And section 13.2 provides that notices are "deemed delivered when mailed by United States registered or certified mail", "delivered in person" or "deposited in [a unit owner's] mailbox."

Thus, even if the Association's purported election could be construed as having occurred at the November 4, 2017 meeting, it would still be invalid due to lack of requisite notice.

¶ 150   We briefly note that, at oral argument, the Association's counsel suggested that we should overlook the use of e-mail notice for the November 2017 meeting because all unit owners apparently agreed to the use of e-mail, and because they actually attended the noticed meeting. Counsel conceded that this form of notice was not authorized by the declaration but suggested that such non-compliance is immaterial absent a showing of prejudice. New arguments cannot be raised on oral argument. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). In any event, the Association was bound to comply with its declaration and bylaws. See *Alliance*, 2015 IL App (1st) 150169, ¶ 27. There is no question that it did not do so.

¶ 151   We thus affirm the June 1, 2021 order granting summary judgment to defendants, insofar as it found that "the Board of Darren Doss and Eric Cathey elected following the November 4, 2017 meeting was not validly elected." That is, the trial correctly found that defendants were entitled to summary judgment on count I, to the extent the Association sought a declaration as to the validity of the purported November 2017 election.

¶ 152   Since the 2017 Board Was Not Valid, The Instant Litigation Was Not Properly

Authorized and the Association Lacks Standing

¶ 153   Our conclusion that the November 2017 board election was invalid leads us to affirm the remainder of the June 2021 summary judgment order for a single reason: lack of standing. As the trial court recognized, since the Association's purported board was invalid, the instant lawsuit (including counts II through VI) was not duly authorized and subject to dismissal on that basis. For that reason, we affirm the grant of summary judgment to defendants, without needing to reach the merits of the remaining issues raised by the Association in this appeal.  In doing so, however,

we recognize our decision will not affect the ability of one or more unit owners to raise similar claims in a derivative action.

¶ 154 The Act states "[t]he board of managers shall have standing and capacity to act in a representative capacity in relation to matters involving the common elements or more than one unit, on behalf of the unit owners, as their interests may appear." 765 ILCS 605/9.1(b) (West 2018). Our court has found this applies to the board's decisions "[w]ith regard to lawsuits brought on behalf of a condominium association." *Davis v. Dyson*, 387 Ill. App. 3d 676, 709 (2008); see also *River Plaza Homeowner's Ass'n v. Healey*, 389 Ill. App. 3d 268, 279 (2009) (enforcing bylaws provision requiring two-thirds of unit owners to consent to the board's decision to litigate, insofar as "section 9.1(b) does not purport to bar unit owners from requiring the board to obtain two-thirds consent prior to exercising its authority to sue"). This court has elsewhere specifically held that the board must vote to authorize litigation matters:

> "the board is required to discuss and vote on association business in meetings open to all unit owners. The question of whether to assert or defend a lawsuit and, necessarily, whether to expend association funds and resources on such litigation is clearly a question involving the business of the association. Although section 18(a)(9) of the Condominium Property Act provides an exception allowing the board to discuss matters in closed sessions, it specifically provides the board must vote on any litigation matter at a meeting open to all unit owners." *Palm*, 2014 IL App (1st) 111290, ¶ 87.

¶ 155   Since we have determined that the November 2017 board election was not valid, that purported board lacked authority to commence and maintain this action on behalf of the Association. As the trial court recognized, this lack of standing mandated dismissal of not only count I, but also the remaining counts (II through VI) of the second amended complaint. As we affirm the June 2021 order granting defendants summary judgment and dismissing the action due to lack of standing, we have no need to separately analyze whether the record supported the trial court's additional determinations in that order regarding (1) the invalidity of the declaration amendment purporting to reduce the number of directors, (2) the validity of the five-member board purportedly elected at the August 2018 meeting conducted by Burke, or (3) whether the successor board purportedly elected by defendants in October 2020 "constitute[d] the current Board."

¶ 156   In doing so, we recognize (as did the trial court), that individual unit owners may assert similar claims against defendants in a derivative action. See *Davis,* 387 Ill. App. 3d 676 (unit owners may bring derivative action on behalf of a condominium association against the current board of directors or former directors). We emphasize that our determination that there was no standing to maintain the instant lawsuit does not have preclusive effect with respect to any other issues that may be properly asserted in a derivative action. In this sense, we are guided by the reasoning in *River Plaza Homeowner's Ass'n*, 389 Ill. App. 3d 268. There, our court affirmed dismissal of the plaintiff condominium association's suit for lack of standing, since the association's board failed to comply with its bylaws' requirement to obtain the consent of two-thirds of unit owners before filing suit. *Id.* at 281. Our court proceeded to explain that, given the lack of standing, it would affirm dismissal without deciding the merits of any other issues:

> "Having determined that the board lacked standing or authority to
> bring this suit, we then do not have jurisdiction to hear it. If we ruled

on the other motions, we would, in effect, be giving preclusive effect to claims that the board did not have standing or authority to bring, and to litigation that the proper party, namely the Association, was not a party to. See *Golden Rule Insurance Co. v. Schwartz*, 203 Ill. 2d 456, 469 (2003) ('[t]he courts of Illinois do not issue advisory opinions'). Our ruling today and the trial court's rulings below have no *res judicata* effect, except for our ruling that the board did not have standing or authority to sue. [Citation.]" *Id*. at 282.

Thus, the *River Plaza Homeowner's Ass'n* court affirmed the dismissal but noted it was "without prejudice to the Association's ability to file suit, after a two-thirds vote by its members, if they choose to do so." *Id*.

¶ 157    We reach a similar result. As we conclude the November 2017 board was invalid and thus lacked authority to maintain this action on behalf of the Association, we affirm summary judgment for defendants on that basis without deciding the merits of any of the other claims in the lawsuit, including the validity of the boards elected by defendants. In turn, our decision to affirm summary judgment for defendants has no preclusive *res judicata* effect, except with respect to the invalidity of the November 2017 board. Thus, although we affirm dismissal of all six counts of the second amended complaint, this order does not bar any unit owners from asserting similar claims against defendants in a proper derivative action. For instance, a derivative action could potentially seek a determination as to the alleged invalidity of the August 2018 board election or subsequent board elections conducted by Burke.

¶ 158    The Association's Breach of Fiduciary Duty Claims And Requests for Injunctive Relief
Are Irrelevant to the Instant Appeal But May Be Raised in a Derivative Action

¶ 159   Before concluding, we note that the Association's briefing and oral argument devoted significant time to describing Burke's alleged breaches of fiduciary duty and other conduct unrelated to the appealed-from orders. The Association emphasized Burke's alleged violation of the declaration's limit on the number of rental units, his alleged withholding of monthly assessments due to the Association, and his alleged failure to address and pay for excess water usage by certain condominium units. In its briefs and again at oral argument, the Association urged this court to impose injunctive relief to compel Burke to sell certain rental units under his control, suggesting we appoint an interim receiver or similar custodian. These contentions and requests for relief are inappropriate, insofar as this appeal is limited to the trial court's orders on the motions for summary judgment regarding count I of the second amended complaint. That count simply did not include such allegations of Burke's misconduct, and thus it is improper for us to discuss them or related requests for injunctive relief. However, we again note that our decision in this appeal does not preclude any unit owners from raising similar allegations or requests for relief in a proper derivative lawsuit.

¶ 160   CONCLUSION

¶ 161   In summary, we affirm in all respects the trial court's September 18, 2020 order denying the Association's motion for summary judgment on count I of the second amended complaint. Because the purported November 2017 board election was invalid, we also affirm the trial court's June 1, 2021 order granting defendants summary judgment on count I and dismissing the remaining counts on the basis of lack of standing. In doing so, we do not make any preclusive findings as to the validity of the August 2018 board election conducted by Burke or the merits of any other factual allegations against him. We again note that our decision does *not* bar individual

unit owners from raising, in a proper derivative action, claims similar to those contained in the now-dismissed second amended complaint.

¶ 162   Affirmed.